**Slip Op. 05-86**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

_____
: 
UNITED STATES,                          :
                                        :
    Plaintiff,                    :
                                        :
    v.                            :    Court No. 02-00106
                                        :
FORD MOTOR COMPANY,                     :
                                        :
    Defendant.                    :
_____:


       Plaintiff, the Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs"), seeks collection of a civil penalty and customs duties pursuant to 19 U.S.C. § 1592 (1988) concerning entries of automotive dies made by Ford Motor Company ("Ford"), defendant, in 1989. Customs claims that Ford committed fraud, or was grossly negligent or negligent by making material false statements and/or omissions in connection with the entry of the merchandise at issue and, thereby, violated 19 U.S.C. § 1592. Accordingly, Customs seeks $184,495 for unpaid duties, and civil penalties in the amount of $21,314,111 if Ford's conduct is found to be fraudulent; $3,497,080 if Ford was grossly negligent; or $1,748,540 if Ford was negligent. Ford responds that the merchandise at issue was entered at the value known at the time of entry, thus violating no Customs laws. Ford also counterclaims that it is entitled to recoup any overpayment in duties it has tendered.

       Held: Pursuant to the findings of fact and conclusions of law, judgment is entered in favor of Customs. Ford's conduct was grossly negligent in its entry of the merchandise subject to this action. Accordingly, Ford is ordered to pay $184,495 for unpaid duties and assessed a penalty of $3,000,000, plus lawful interest.

[Judgment is held in favor of Customs in the amount of $184,495 for unpaid duties and Ford is assessed a penalty of $3,000,000, plus lawful interest.]

       <u>Peter D. Keisler</u>, Assistant Attorney General, <u>David M. Cohen</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>David A. Levitt</u> and <u>David S. Silverbrand</u>); of counsel:

Jeffrey E. Reim and Katherine F. Kramarich, Bureau of Customs and Border Protection, for the United States, plaintiff.

Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP (David M. Murphy, Steven P. Florsheim, Robert B. Silverman, and Frances P. Hadfield); of counsel: Paulsen K. Vandevert, for Ford Motor Company, defendant.

Dated: July 20, 2005

**OPINION**

**TSOUCALAS, Senior Judge:** Plaintiff, the Bureau of Customs and Border Protection of the Department of Homeland Security ("Customs")[1], seeks collection of a civil penalty and customs duties pursuant to 19 U.S.C. § 1592 (1988) concerning entries of automotive dies made by Ford Motor Company ("Ford"), defendant, in 1989. Customs claims that Ford committed fraud, or was grossly negligent or negligent by making material false statements and/or omissions in connection with the entry of the merchandise at issue and, thereby, violated 19 U.S.C. § 1592. Accordingly, Customs seeks $184,495 for unpaid duties, and civil penalties in the amount of $21,314,111 if Ford's conduct is found to be fraudulent; $3,497,080 if Ford was grossly negligent; or $1,748,540 if Ford was negligent. See Compl. Ford responds that the merchandise at issue

---

[1]     The United States Customs Service was renamed the Bureau of Customs and Border Protection of the Department of Homeland Security, effective March 1, 2003. See Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135 (2002); Reorganization Plan for the Department of Homeland Security, H.R. Doc. No. 108-32 (2003).

was entered at the value known at the time of entry, thus violating no Customs laws. Ford also counterclaims that it is entitled to recoup any overpayment in duties it has tendered.

**DISCUSSION**

In its complaint, Customs alleges that Ford made false statements and/or material omissions in entering automotive tooling dies and equipment into the United States and that such conduct was fraudulent, grossly negligent, or negligent. See Compl. These false statements and/or material omissions include: (1) failing to notify Customs that the prices declared at entry were provisional and subject to upward adjustments; (2) certifying to Customs at entry that the prices declared were true and correct when in fact the invoices failed to include the cost of known engineering changes; and (3) failing to notify Customs "at once" when information was received after importation indicating that the prices declared at entry had increased due to the value of the engineering changes. See Compl. ¶ 6. As a result, Customs claims that the United States was deprived of lawful duty, which it seeks in addition to civil penalties. A bench trial was held on February 28 through March 10, 2005. Parties submitted post-trial briefs on April 15, 2005.

Pursuant to USCIT R. 52(a), "[i]n all actions tried upon the facts without a jury . . ., the court shall find the facts specially and state separately its conclusions of law thereon . . . ." USCIT R. 52(a) (2002). At trial, the Court heard testimony from sixteen witnesses.[2] Customs produced three witnesses who testified on various factual matters concerning: how Customs' investigations were commenced and conducted; Customs' investigation of Ford ("FN-36 investigation"); and Customs' factual findings during and resulting from the FN-36 investigation. Customs produced Mr. Michael Turner, former Special Agent in the Detroit Customs Office of Enforcement and primary investigator of Ford; Mr. Robert Neckel, former group supervisor of the Detroit Customs Office of Enforcement; and Mr. Richard Hoglund, former Special Agent in Charge of the Detroit Customs Office of Enforcement. Ford produced three witnesses who testified, inter alia, about their knowledge of Customs' investigation and the scope of the investigation as it related to Ford: Mr. Harry Gibson, former attorney in Ford's Office of General Counsel; Mr. Donald Cohen, former manager in Ford's International Transportation and Customs Office; and Mr. Kenneth Coakley, former Ford purchasing representative of stamps and dies for the FN-36 program. Messrs. Gibson and Cohen also testified about Ford's customs compliance

_____

[2]      Each witness' employment history is described as their employment from 1988 to 1993 with additional relevant information.

procedures, compliance record, and Ford's responses to inquiries made by Customs regarding the FN-36 program.

At trial, Customs and Ford introduced documents relating to the FN-36 investigation and the Court admitted such documents into evidence. The Court finds most of this documentary evidence highly probative because it provides contemporaneous accounts of events related to the FN-36 investigation, Ford's responses to the investigation, and Ford's compliance procedures. The Court places substantial weight in the veracity of Customs' Reports of Investigation ("ROI") written contemporaneously to relevant events concerning the commencement of the FN-36 investigation and fact-finding interviews conducted therein. See Pl.'s Ex. 2, 33, 93, 94, 99, 112. The Court, however, gives less weight to the ROIs, particularly Ford ROI # 37, which summarize the findings of the FN-36 investigation, because these ROIs were prepared in anticipation of penalty proceedings. See e.g., Pl.'s Ex. 1, 12, 14. The Court finds that the testimony of Messrs. Gibson and Cohen was not highly probative because it was apparent from their testimony and demeanor that they did not independently recall specific events relating to the FN-36 investigation. The Court, however, found the testimony of Mr. Turner highly probative because it was apparent from his testimony and demeanor that he had intimate knowledge of relevant events and was able to independently recollect the FN-36

investigation. Messrs. Neckel and Hoglund corroborated Mr. Turner's testimony regarding how Customs commenced and conducted investigations during the relevant time period.

The Court also heard testimony regarding procedures and practices pertaining to the entry of Ford's automotive dies in Seattle and Detroit Customs, issuing and responding to Customs' Requests for Information ("CF 28s"), and general import practices (both Customs' and Ford's) from: (1) Mr. Kent Barnes, former Import Specialist in Seattle Customs; (2) Ms. Helen McCarty, former commodities Import Specialist in Detroit Customs; (3) Ms. Dathrenal Davis, former Field National Import Specialist for the commodity automotive team in Detroit Customs; (4) Ms. Angela Ryan, former Supervisory Import Specialist of the automotive team in Detroit Customs, also the Port Director in Detroit Customs from 2000 until she retired; (5) Ms. Denise Rashke McCandless, former Customs Regulatory Auditor in Detroit Customs; (6) Mr. David LaCharite, former Ford analyst in the International Transportation and Customs Office; (7) Mr. James Brown, former supervisor in Ford's customs operations unit; and (8) Mr. Frank Ciavarro, former employee in Ford's customs unit beginning in October, 1989, and currently in Ford's purchasing unit. Ford and Customs stipulated to the admission of deposition testimony of Mr. Phillip Kruzich, former

analyst in Ford's customs and compliance unit.[3]  The Court also heard testimony from Mr. Tom Collins, former administrator in General Motors's ("GM") customs office who had knowledge of Mr. Turner's investigation regarding GM, and Mr. Lowell Blackbourn, former Ogihara America Corporation accounting manager.  The Court finds the testimony of Mr. Collins and Mr. Blackbourn slightly probative because each witness spoke of their general interaction with Customs during the relevant time frame.  Based on their demeanor and given the length of time since the relevant events occurred, the Court finds the testimony of Ms. McCarty, Ms. Davis, Ms. Ryan, Mr. Kruzich, Ms. McCandless, Mr. LaCharite, Mr. Brown, and Mr. Ciavarro slightly probative because each testified to general facts associated with their respective positions.  Regarding events relevant to the FN-36 investigation, these witnesses could only attest to events in general terms, even after having their memories refreshed with the exhibits.  The Court finds Mr. Barnes' knowledge of his communications with Ford as probative based on his demeanor and ability to recollect events in addition to the documentary evidence.  In accordance with USCIT R. 52(a) and having given due consideration to the testimony of all sixteen witnesses and numerous exhibits presented at trial and admitted by

---

[3]  Mr. Kruzich's testimony was submitted via deposition, taken on August 10, 2004, and February 24, 2005.  See Joint Exhibit 1 ("Kruzich").

the Court, the Court now enters judgment in favor of plaintiff pursuant to the following findings of fact and conclusions of law.

## I. Findings of Fact

### A. Findings of Fact Relevant to Ford's FN-36 Program and Entry of the FN-36 Merchandise

1. Ford's program code for the 1990 model year Lincoln Town Car was "FN-36." See Trial Transcript ("TT") at 1051; Pretrial Order, Schedule C ¶ 2.

2. Ogihara Iron Works ("OIW") is the parent company of Ogihara America Corporation ("OAC"), the American subsidiary (referred collectively as "Ogihara"). See TT at 741-42; PX 40.

3. The subject merchandise includes tooling and stamping dies, which is large machinery used to make automotive body parts. Tooling included dies, welding fixtures, and checking fixtures ("FN-36 dies"). See TT at 797 & 1051-52; Pretrial Order, Schedule C ¶ 4. Presses are separate from dies. See TT at 800. OIW built the stamping and tooling dies needed for the FN-36 program in Japan. See Pretrial Order, Schedule C ¶ 3. The dies were then shipped to Michigan where OAC did the actual stamping of panels for Ford. See TT at 202; Pretrial Order, Schedule C ¶ 5. All FN-36 payments were made to OAC, who in turn transferred payment to OIW. See TT at 103-04, 156, 1051; Pl.'s Ex. 112.

4.    Ford, as importer of record, made eleven entries of FN-36 dies between February 2, 1989, and March 12, 1989, which are the entries in dispute. See Pretrial Order, Schedule C ¶ 11; Pl.'s Ex. 69. The entries were handled by Ford's customs broker, J.V. Carr & Sons. See TT at 180 & 235; Pretrial Order, Schedule C ¶ 11; Pl.'s Ex. 69.

5.    In Detroit, Ford made the following entries: entry number 441-4824795-8 on February 2, 1989; 441-4823061-6 on February 9, 1989. In Los Angeles, Ford entered entry number 989-0021515-7 on February 9, 1989. In Seattle, Ford made the following entries: entry number 441-3103656-6 on February 2, 1989; 441-3103684-8 on February 10, 1989; 441-3103705-1 on February 17, 1989; 441-3103778-8 on February 26, 1989; 441-3103780-4 on February 26, 1989; 441-3103777-0 on February 27, 1989; 441-3103799-4 on March 2, 1989; and 441-3103906-5 on March 12, 1989. See Pl.'s Ex. 40, 75, 102.

6.    The value of the FN-36 dies declared upon entry was $63,078,426. See Pretrial Order, Schedule C ¶ 10.

7.    The value of the FN-36 dies declared on the entry summaries ("CF 7501") was the invoice price. See TT at 845. The invoice price was the purchase order agreement value. See TT at 845; Pl.'s Ex. 71. A tool order is a type of purchase order, but one specifically to purchase a particular die or

set of dies.[4]  <u>See</u> TT at 742.  A purchase order is also considered a contract.  <u>See</u> TT at 742.  The base tool order is the initial order made by Ford for the dies.  <u>See</u> TT at 743.

8. The base tooling order for the FN-36 dies, T510288, was issued on May 27, 1987, in the amount of $42,544,884.  <u>See</u> Pretrial Order, Schedule C ¶ 3; Pl.'s Ex. 24.  Subsequently, 17 amendments were made to the base tool order between May 27, 1987, and January 16, 1991, with the amount on the 17th amendment being $66,075,960. <u>See</u> Pretrial Order, Schedule C ¶¶ 6 & 12; Pl.'s Ex. 24.  Amendment 17 to the base tool order, dated January 16, 1991, is an audit reduction lowering the price of the FN-36 dies.  <u>See</u> Pl.'s Ex. 24.

9. 204 separately numbered purchase orders were also issued between November 29, 1988, and November 16, 1989, for engineering changes and other price adjustments ("engineering purchase orders").  <u>See</u> Pretrial Order, Schedule C ¶ 6; Pl.'s Ex. 2, 25, 39.

10. To track a program at Ford, purchase order amendments should reference the previous purchase orders issued.  This was done by referencing the project number on each purchase order.  <u>See</u>

---

[4]    Based on the testimony from the witnesses, tool orders and purchase orders were used interchangeably.  <u>See e.g.</u>, TT at 742.  For clarity, the Court uses "tool orders" when referring to the base tool order and seventeen amendments, and "purchase orders" when referring to the 204 engineering changes.

TT at 775-76 & 838; Pl.'s Ex. 47 & 105; Def.'s Ex. C.

11. The base tool order and the seventeen amendments all have the project number "1D90A00" designation on them to identify them as part of the FN-36 program and to track program costs. See TT at 150-51 & 751-54; Pl.'s Ex. 24. The 204 engineering purchase orders also have the project number "1D90A00" designation on them. See Pl.'s Ex. 25. Ford employees knew that the project number was a way of tracking purchase orders associated with a particular project. See TT at 751-54, 775-76, 837-38.

12. A legend on the base tool order, amendments, and some of the engineering purchase orders states that "[T]he price set forth in this Purchase Order or Amendment shall be adjusted so as to credit buyer in the amount, if any, by which such price exceeds seller's actual cost as verified." followed by the signature of K.J. Coakley and the date signed. See Pretrial Order, Schedule C ¶ 9; Pl.'s Ex. 24 & 25.

13. To comply with a new seat-belt law in the United States, the FN-36 program had a launch date of August 1, 1989. See TT at 747-49. Engineering changes on the dies were frozen by Ford on October 10, 1988, so that the dies could be transported from Japan to Michigan. See TT at 213-14, 762-63, 801-02; Pl.'s Ex. 64. The purchase orders, on their face, do not indicate whether they were issued for United States work or

foreign source work.  <u>See</u> TT at 795; Pl.'s Ex. 25.

14. Engineering changes to the dies were known and expected by Ford as designs for the FN-36 program evolved, translating into an increase in the price.  <u>See</u> TT at 745 & 751; Kruzich at 40-41.  Ford knew that the invoice price for the FN-36 dies stated in an entry summary was rarely the final price.  <u>See</u> TT at 839-40.

15. Tool order amendments 16 and 17 state that: "[T]he amount shown on this invoice represents the actual incurred costs to manufacture or purchase the tooling described in the referenced tooling order and/or amendment(s), does not exceed the amount authorized, and includes only those acceptable categories of cost described in the tooling guidelines provided by Ford."  Pl.'s Ex. 24; Def.'s Ex. BBBB.

16. Ford's International Transportation and Customs Office was divided into the customs and traffic units.  The customs unit was further divided into compliance and operations units.  <u>See</u> TT at 753-54 & 818-19; Kruzich at 5-6.  Ford's customs compliance unit came into existence in the late 1980s/early 1990s.  <u>See</u> Kruzich at 15.

17. Ford had an internal policy in place on November 7, 1983, and updated on April 14, 1989, requiring Ford employees in the purchasing department to send copies of each purchase order and amendments to five internal Ford units including the

traffic unit.  A sixth copy was sent to the supplier.  See TT at 163-64, 753, 774-76; Kruzich at 19-24; Pl.'s Ex. 2, 47, 48, 105; Def.'s Ex. C.

18.  Ford's customs unit would not know about an upcoming entry of imported merchandise unless Ford's purchasing unit had sent them a copy of the purchase order.  See TT at 821-25 & 830; Kruzich at 27-36; Pl.'s Ex. 99.  Ford did not have a formal policy, however, for what its customs unit was to do with the purchase order upon receiving it.  See TT at 823-25; Pl.'s Ex. 99.  There were no internal verification procedures in place to ensure that Ford's customs unit was receiving copies of all the purchase orders issued by purchasing.  See TT at 823-25 & 830; Kruzich at 27-36; Pl.'s Ex. 40 at 7.

19.  With regard to the FN-36 dies, Ford failed to adhere to its internal policy whereby its purchasing unit notified its customs unit of the engineering changes through the transmittal of purchase orders prior to entry.  See Pl.'s Ex. 105; see also TT at 163-73; Pl.'s Ex. 2.

20.  Ford did not have a mechanism in place to verify that the information submitted in an entry summary filed by the broker was based on the correct price of the merchandise.  See TT at 824-25; Pl.'s Ex. 40 & 99.  Ford's customs unit would learn of changes in the purchase order price, usually after entry, when it received payment information from Ford's accounting unit.

See Kruzich at 30-31. Ford's customs unit was also aware that it did not receive all the purchase orders because of information later uncovered when answering CF 28s. See TT at 821-32; Kruzich at 42-45. Ford's customs unit, however, did not advise the purchasing unit supervisors of this issue. See Kruzich at 44-45.

21. A Customs CF 28 is a request for information sent to importers when Import Specialists have questions regarding an entry. See TT at 347 & 825-26.

22. Ford's customs unit did not consider receipt of a purchase order before entry as important because the entry summary could be amended. The focus at Ford was comparing payments made to vendors against invoices. See TT at 850-51.

23. Ford knew it had a duty to report to Customs any additional purchase orders, including engineering changes, that affected the entered value of imported merchandise. See Kruzich at 40-42.

24. During the late 1980s to early 1990s, Ford was importing billions of dollars each year. See TT at 964.

**B.     Findings of Fact Related to Customs' Investigation of Ford**

25. An investigation could be initiated in different ways. An open investigation could lead into new investigations of either different violations or other importers. See TT at 74,

526, 580-81. Investigations could also begin with referrals from import specialists. See TT at 489-90, 523, 580. When information obtained in an open investigation led to another, notes regarding the new investigation would be contained in the former investigation's file until a separate file was opened. See TT at 526 & 581-82; Pl.'s Ex. 33.

26. Customs investigations would be documented in ROIs in which agents would summarize interviews and investigative activity. ROIs would often be written contemporaneously to the events reported therein, but would also be written at a later date from notes taken during earlier events. See TT at 76-77, 158-59, 285-87. Material events that would be recounted in an ROI would include: telling an importer it was under investigation, telling an importer the scope of the investigation had expanded, discovery that merchandise was undervalued, and requesting documents to be produced. See TT at 286-88.

27. An investigative agent's duties included keeping a careful record of the dates relevant information was obtained. See TT at 291-97; Def.'s Ex. A.

28. The term "formal investigation" is not defined in any Customs document submitted to the Court. See Def.'s Ex. A. Among Customs personnel, a "formal investigation" means a file has been opened within Customs' internal case management system to track cases. The term "formal investigation" has a different

meaning when used in Customs' prior disclosure regulations. The term "formal investigation" is not used interchangeably among the two definitions.  See TT at 548 & 553-54.

29.  In the late 1980s, Customs conducted a national investigation entitled, "Rebate Adjustment Program," or "RAP."  Operation RAP investigated allegations that certain United States importers were manipulating freight rates in cooperation with foreign shippers to affect the entered value of merchandise to Customs.  OAC was one of the companies being investigated and on November 27, 1989, Customs executed a search warrant on OAC's Michigan facility seizing numerous documents.  See TT at 80-81 & 528-29; Pl.'s Ex. 33; Def.'s Ex. YYY & ZZZ.

30.  Mr. Turner took over the Ogihara case in August-September, 1990.  See TT at 314-15.  Mr. Turner was only investigating OAC, but his attention was drawn to Ford while reviewing the seized OAC documents.  He began comparing Ford's FN-36 invoices submitted to Customs against Ford's payments made to OAC for the same merchandise. See TT at 82-85 & 268; Pl.'s Ex. 33; Def.'s Ex. YYY & ZZZ.

31.  On October 18, 1990, Mr. Turner met with Mr. Gibson and after delivering two summonses in an unrelated matter, discussed presses purchased from Ogihara for the FN-36 program.  See TT at 96-99 & 125-26; Pl.'s Ex. 94.  Mr. Turner asked Mr. Gibson to identify an entry number (441-4823061-6).  See TT at 333 &

893; Pl.'s Ex. 35. Mr. Turner "advised [Ford] that Customs would ask to review Ford's records related to payment for and receipt of the presses purchased from OIW and OAC" for the FN-36 program. Pl.'s Ex. 33; see also TT at 98-99 & 339-40; Pl.'s Ex. 94. Mr. Turner did not specifically request records from Ford and did not tell Ford that it was under investigation at this October 18, 1990, meeting. See TT at 301-05, 339-40, 893-95; Pl.'s Ex. 33.

32. On December 19, 1990, Mr. Turner told OAC's attorneys that the OAC investigation was expanding to include whether the costs of GM-33 and FN-36 dies from OIW were properly reflected in invoices and entry summaries. See TT at 101-02; Pl.'s Ex. 33 & 97. On January 7, 1991, Mr. Turner wrote OAC ROI #8 recording the October 18, 1990, meeting and December 19, 1990, expansion of investigation. See TT at 307-08; Pl.'s Ex. 33.

33. Between October 18, 1990, and March 8, 1991, Mr. Turner requested documents from Ford regarding OAC. See Pl.'s Ex. 35, 37, 97. On March 8, 1991, Mr. Turner had a phone conversation with Mr. Hamell, of Ford, following up on his previous request for documents regarding FN-36 entries of stamping dies and payments to Ogihara. See TT at 109 & 115-19; Pl.'s Ex. 97. Mr. Turner learned that Ford was compiling the requested information and was also conducting an internal audit. See TT at 118 & 894-96; Pl.'s Ex. 97. The March 8,

1991, phone conversation is memorialized in Mr. Turner's handwritten notes in the investigatory record, but not included in a ROI. See TT at 115 & 316; Pl.'s Ex. 97.

34. By March 8, 1991, Mr. Turner had not only expanded the OAC investigation to include Ford as a witness therein, but also was investigating Ford as a separate target concerning its payments to OAC and declarations to Customs regarding the FN-36 program. See TT at 102-03 & 115-19.

35. On April 18, 1991, Detroit Customs Office of Enforcement sent an internal memorandum to Detroit Customs Regulatory Audit requesting an in-depth review of OAC's records for presses and dies, including a comparison of payments made by Ford against OIW's invoices. See TT at 119-24; Pl.'s Ex. 77 & 93.

36. On April 30, 1991, Ford completed its internal audit of the FN-36 tooling and dies, entitled "Ogihara America Corporation Tooling Audit" which includes the 204 purchase orders for engineering changes. See Pl.'s Ex. 99A; see also TT at 855; Pl.'s Ex. 97.

37. In a letter dated May 6, 1991, Ford requested a second extension to answer a CF 28 from Seattle Customs. See Pl.'s Ex. 32. The letter also stated that Ford's customs unit had been informed on April 22, 1991, that "final audit results and price adjustments will soon be available" from OIW. Pl.'s Ex. 32; see also TT at 476-77. Ford's customs unit knew of the

engineering purchase orders, but did not disclose them because Ford was unsure whether the work was done in Japan or the United States. See TT at 879-81 & 942-43.

38. In a letter dated May 23, 1991, Ford updated Seattle Customs on its CF 28 response to a different FN-36 entry than the one discussed in its May 6, 1991, letter. See Def.'s Ex. Y. The letter stated that Ford wanted to confirm that "the final audit and price adjustments are in agreement" with its CF 28 response. Def.'s Ex. Y.

39. On June 7, 1991, Customs issued Ford a summons for all documents relating to "dies, molds, and any other article" of the FN-36 program and OIW. Pl.'s Ex. 38. The summons requested "all purchase orders and payment records" and "engineering change and modification orders" among other records. Pl.'s Ex. 38; see also TT at 126-31 & 600-01; Pretrial Order, Schedule C ¶ 19; Pl.'s Ex. 93 & 112.

40. By June 7, 1991, Ford knew or should have known that it was being investigated by Customs regarding the FN-36 entries. See TT at 540-41.

41. In a letter dated July 3, 1991, Ford informed Seattle Customs that any correspondence regarding four FN-36 entries entered at Seattle would now be directed to Detroit Customs. See Pl.'s Ex. 54.

42. On August 6, 1991, Ford sent Detroit Customs a "supplemental response" to its previous November 20, 1989, response to the March 28, 1989, CF 28. See Pl.'s Ex. 39. Ford reported the 17th amendment to the base tool order and then revealed that there had been an "additional 204 separate Purchase Orders" issued to OAC for dutiable engineering changes that had been "discovered" by Ford's customs unit in April 1991. See Pl.'s Ex. 39. This disclosure was the first time Customs was informed of the existence of the 204 engineering purchase orders. See TT at 357. The letter estimated $684,417 for unpaid duties owed from an undeclared value of $16.7 million in engineering changes. The unpaid duty owed was determined by applying an allocation method derived from the twelve subject entries. See Pl.'s Ex. 39 & 74; see also TT at 131-38, 357-61, 627-28; Pretrial Order, Schedule C ¶¶ 20 & 21.

43. Customs reviewed Ford's August 6, 1991, letter and calculated that Ford owed $689,775 for unpaid duties. Customs also accepted the allocation method used by Ford to determine the amount of unpaid duty owed. See TT at 361-62 & 627-28; Pl.'s Ex. 40.

44. Each engineering purchase order represents a separate engineering change to the FN-36 dies. The engineering changes affected the price of the FN-36 dies, both increasing and decreasing price. See TT at 755-65; Pretrial Order, Schedule

C ¶ 7; Pl.'s Ex. 25, 39, 40, 74.

45. The engineering purchase orders were not cross-referenced as amendments to the base tool order because an internal "implementation of a mechanized purchase order system" would not allow the issuance of an amendment until the previous amendment had been processed. The system would allow independent purchase orders to be issued without regard to sequence. See Pl.'s Ex. 105, see also TT at 167-68; Pl.'s Ex. 2 & 99.

46. On August 21, 1991, Mr. Turner opened a separate file record for the FN-36 investigation. Customs was investigating Ford before August 21, 1991, as part of the OAC investigation. The assignment of a separate case number was an internal mechanism at Customs to track documents and investigative findings. See TT at 153-55; Pl.'s Ex. 112; Def.'s Ex. DD.

47. On August 27, 1991, Mr. Turner sent Customs Regulatory Audit a memorandum requesting a separate audit report of Ford's FN-36 transactions from the previously requested audit of OAC. See Pl.'s Ex. 77 & 79; Def.'s Ex. DDDD.

48. On November 8, 1991, Ford submitted additional documents to Customs pursuant to the June 7, 1991, summons including copies of the twelve entry summaries of FN-36 dies filed by Ford in the ports of Detroit, Seattle, and Los Angeles. See TT at 148-49; Pl.'s Ex. 105.

49. On November 22, 1991, Ford tendered a check to Detroit Customs for $689,775 for unpaid duties owed on the engineering changes in the FN-36 program. See Def.'s Ex. BB.

50. On July 6, 1992, Customs Regulatory Audit published its audit report of Ford and the FN-36 program. See Pl.'s Ex. 40. Ford cooperated with Regulatory Audit by providing requested information during the compilation of the audit report. See TT at 630-31; Pl.'s Ex. 40. Ford, however, did not submit its internal audit dated April 30, 1991 and it was not included in Customs' audit. See TT at 641. The audit report states that the dutiable value of the FN-36 program was $79,894,722. See Pl.'s Ex. 40. On its entry documents, Ford had declared $63,078,426. See Pretrial Order, Schedule C ¶ 10. Thus, Ford had undervalued the FN-36 dies by $16,816,296, which resulted in a loss of revenue in the amount of $689,775. See Pl.'s Ex. 40. Customs Regulatory Audit used the same allocation formula as Ford had used in its August 6, 1991, letter to determine the amount of unpaid duty owed. See TT at 627-28.

51. The Pre-Penalty Notice was issued on January 10, 1995. See Pl.'s Ex. 41. Customs reappraised the dutiable value of the FN-36 dies upon Ford's submission of its internal audit, dated April 30, 1991. See TT at 641-46; Pl.'s Ex. 43, 75, 99A. Customs issued a Notice of Penalty reflecting the reappraisal on July 19, 1995. See TT at 641-46; Pl.'s Ex. 43. The final

appraised value of the FN-36 dies was $84,393,564; the final undeclared value to Customs was $21,314,111; and the final loss of revenue to the United States was $874,270. See Pl.'s Ex. 43 & 75. After accounting for Ford's November 1991, payment, the remaining unpaid duty amount owed is $184,495. See Pl.'s Ex. 43. Customs again applied the same allocation method used in its audit and by Ford. See TT at 381; Pl.'s Ex. 75. The $184,495 difference formed the basis of Customs' complaint. See Compl. ¶ 9.

### C. Findings of Fact Related to Ford's Provisional Value Policy and Internal Procedures

52. Ford had a <u>formalized</u> practice of designating certain entries as "provisional" values or prices. See Def.'s Ex. C. Ford's Customs Compliance Manual states: "[i]n the event that the value is not completely and correctly shown, a 'provisional' disclaimer is stated on the invoice, thereby advising customs." Def.'s Ex. C; see also Pretrial Order, Schedule C ¶ 1. Ford's Supply Manual states: "[p]rovisional values must be used when actual values are not available and the words 'Provisional Value' must be shown on the commercial invoice." Def.'s Ex. C; see also Pretrial Order, Schedule C ¶ 1. Ford defined a "provisional" entry, invoice, value, or price as merchandise imported through Customs without knowledge of the final price. See TT at 215-16, 868-69, 1022. Ford would

notify Customs that merchandise was entered at provisional value either on the invoice or on a separate memorandum to Customs. See TT at 1022-24; Pl.'s Ex. 85 & 86.

53. At the time of the subject entries were made, Ford had an informal procedure with its broker when to advise Customs that the invoice price was not the final price. See TT at 228-30, 332, 839-40, 869-71, 1022-24. Ford would orally instruct its broker to place the words "provisional pricing or value" on an invoice. See TT at 869-71, 992. Ford implemented formal procedures for provisional value with its broker in 1991, after the subject entries. See TT at 247 & 332; Pl.'s Ex. 107. The formal procedure required that all entries for tooling, dies, molds and machinery be entered with a letter alerting Customs that the value was provisional. See Pl.'s Ex. 107.

54. Without indicating provisional value on an entry summary, an import specialist would not know that the price listed was incomplete and to withhold liquidation. See TT at 216, 427-28, 493-94.

55. Prior to the FN-36 entries, Ford had used provisional values when entering machinery, tooling, dies, and presses. See TT at 868.

56. Ford had previously entered merchandise without alerting Customs that the entry was provisional. Ford would then later

advise Custom in a CF 28 response that the prices declared had been provisional. When provisional values were first relayed to Customs in a CF 28 response, the information was accepted, treated as a prior disclosure and possibly subject to penalties. See TT at 430-31 & 507-08.

57. Between 1988 and 1991, there were no Customs regulations or directives requiring an importer to use the words "provisional value" or pricing on entry documents. See TT at 440, 476, 511, 870.

58. The entry summaries for the FN-36 dies did not indicate that the transaction value was provisional or subject to change. See TT at 229-30; Pl.'s Ex. 26E & 113.

59. There was a lack of communication between Ford's internal units about Ford's provisional value policy and when to use it. See TT at 705-06, 779-80 (stating "I have never used [provisional value] in 32 years."), 827-29; Pl.'s Ex. 2.

60. Ford had submitted internal customs training videos and manuals to Customs for review and suggestions in 1990-91. See Def.'s Ex. D, F, G, H, M.

61. In 2000, Customs published a compliance audit report reviewing Ford's compliance with Customs laws during the 1996 calender year. Overall, Ford is credited as having met an acceptable level of compliance. Areas where Ford was lacking included internal control procedures especially in verifying the

reliability of its broker's work, maintenance of records, and ensuring that correct values were reported on entries.  See Pl.'s Ex. 114.

**D.   Findings of Fact Related to Customs' CF 28s and Ford's Responses**

62. Customs often sent CF 28s to importers when the imported merchandise was an automotive die because most dies usually had tooling or assists, which could affect dutiable value. See TT at 347, 388, 468-70.  The issuance of CF 28s was fairly routine and it was not uncommon for Ford to request additional time to respond to CF 28s.  See TT at 478-79 & 832-33. Information submitted as a response to a CF 28 was certified by the importer's signature to be true and correct. See Pl.'s Ex. 29, 30, 31, 113.

63. Answering CF 28s was not a high priority at Ford.  See TT at 826-29 & 851-52.

64. Detroit Customs issued a CF 28 regarding entry 441-4823061-6 on March 28, 1989, to which Ford responded on November 20, 1989, and sent a supplemental response on August 6, 1991.  See Def.'s Ex. BBBB; see also Pretrial Order, Schedule C ¶¶ 13, 15, 20; Pl.'s Ex. 113.  Ford's response dated November 20, 1989, did not mention that Ford was conducting an internal audit.  See Def.'s Ex. BBBB.  The letter described the different dies imported for the FN-36 program and included

copies of the base tooling order and sixteen of the seventeen amendments.  See Def.'s Ex. BBBB.

65. Seattle Customs issued a CF 28 regarding entry 441-3103656-6 on March 2, 1989, reissued it on February 28, 1990, to which Ford responded on May 23, 1991, asking for an extension.  See Pretrial Order, Schedule C ¶¶ 14 & 18; Pl.'s Ex. 29; Def.'s Ex. Y.

66. Seattle Customs issued a CF 28 regarding entry 441-3103684-8 on March 1, 1989, reissued it on December 5, 1990, to which Ford responded on January 9, 1991, and May 6, 1991, asking for extensions.  See TT at 480-81; Kruzich at Ex. 5; Pretrial Order, Schedule C ¶ 17; Pl.'s Ex. 31, 32, 51, 52.  Ford's May 6, 1991, letter also stated that its delay in responding was because final audit results were soon available.  Pl.'s Ex. 32.  Seattle Customs met with Ford in late 1990 to finalize Ford's penalties in an unrelated Fuji dies case, after which this unanswered CF 28 was discussed.  See TT at 872-74 & 897; Pl.'s Ex. 27.

67. Seattle Customs expanded the CF 28 reissued on December 5, 1990, to include entries 441-3103705-1, 441-3103778-8, and 441-3103777-0.  See Pretrial Order, Schedule C ¶ 16; Pl.'s Ex. 31 & 54.  In Ford's response, dated July 3, 1991, to these four Seattle entries, Ford only stated that a summons had been issued by Detroit Customs and that all future correspondence

would be directed to the Detroit office.  See Pl.'s Ex. 54.

68.  Seattle Customs also issued a CF 28 for entry 441-3103780-4 on March 16, 1989, to which Ford responded on March 30, 1989, asking for a ninety day extension.  See Pl.'s Ex. 2 at Ex. 7; Pl.'s Ex. 30.

69.  As a practice, Customs accepted disclosures of values that had changed from the entered value in a CF 28 response.  If additional duties were paid with the corrected value, Customs would accept the payment, check the information provided, and possibly refer the information to Customs' auditors or special agents for further review.  See TT at 496-97.

70.  Automotive dies were not automatically bypassed by Customs because they often had assists, were not the same type of die in each entry, and were fairly expensive items.  See TT at 426-27, 448, 499.  Ford's dies were not on bypass in Seattle or Detroit.  See TT at 448 & 499.

## II.  Conclusions of Law

The Court has jurisdiction pursuant to 28 U.S.C. § 1582 (2000).[5]  In actions brought for the recovery of any monetary

---

[5]    Relevant portions of the statute state:

The Court of International Trade shall have exclusive jurisdiction of any civil action which arises out of an import transaction and which is commenced by the United States --

penalty claimed under section 592 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1592 (1988), all issues are tried de novo, see 28 U.S.C. § 2640(a)(6) (2000), including the amount of the penalty. See 19 U.S.C. § 1592(e)(1). The level of culpability has a direct correlation to the maximum amount of penalty that can be assessed. See 19 U.S.C. § 1592(c).

Customs has alleged that Ford violated 19 U.S.C. § 1592, thereby depriving the United States of all or a portion of lawful duty through fraud, or in the alternative, gross negligence or negligence. See Compl. In pertinent part, 19 U.S.C. § 1592(a) states:

> Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty thereby, no person, by fraud, gross negligence, or negligence–
>> (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of–
>>> (i) any document, written or oral statement, or act which is material and false, or
>>> (ii) any omission which is material . . .

19 U.S.C. § 1592(a). An act or omission is deemed material if it has the potential to alter the appraisement or liability for duty. See 19 C.F.R. pt. 171, App. B(A) (1988). The issue of materiality

---

(1) to recover a civil penalty under section 592 . . . of the Tariff Act of 1930 . . .

(3) to recover customs duties.

28 U.S.C. § 1582.

is for the Court to determine.  See <u>United States v. Hitachi Am.,</u> <u>Ltd.</u> ("<u>Hitachi I</u>"), 21 CIT 373, 386, 964 F. Supp. 344, 360 (1997), <u>aff'd in part and rev'd in part on other grounds</u>, 172 F.3d 1319 (Fed. Cir. 1999); <u>see also</u> <u>United States v. Rockwell Int'l Corp.,</u> 10 CIT 38, 42, 628 F. Supp. 206, 210 (1986) (stating that "the measurement of the materiality of the false statement is its potential impact upon Customs' determination of the correct duty for the imported merchandise").

### A. Customs Failed to Prove that Ford's Conduct was Fraudulent

Fraudulent conduct "results from an act or acts (of commission or omission) deliberately done with intent to defraud" the United States and must be established by clear and convincing evidence. 19 C.F.R. pt. 171, App. B(B)(3); <u>see also</u> 19 U.S.C. § 1592(e)(2) (burden is on Customs).  Fraud occurs if an importer "knowingly" enters goods by means of a material false statement or omission. <u>See</u> <u>Hitachi I</u>, 21 CIT at 402, 964 F. Supp. at 371.  "Intent is a factual determination particularly within the province of the trier of fact."  <u>Allen Organ Co. v. Kimball Int'l, Inc.</u>, 839 F.2d 1556, 1567 (Fed. Cir. 1988).

Based on the evidence and the testimony submitted during trial, the Court finds that Customs has failed to show by clear and convincing evidence that Ford intentionally violated 19 U.S.C. §

1592 when it entered the subject merchandise. Customs failed to show any intent by Ford to deliberately misrepresent the value of the 204 engineering purchase orders from Customs. Customs also did not show that Ford employees intentionally or knowingly misplaced purchase orders or colluded with other employees to defraud the United States. Rather, the evidence demonstrated that Ford had in place internal compliance procedures. Such procedures illustrate Ford's attempt to comply with its legal obligations. Whether Ford's internal procedures ensured that Ford met its statutory obligations is not central to a fraud analysis. Rather, it is significant that Ford had measures in place because they contravene a showing of fraud.

Ford, for example, had customs compliance and supply manuals that instructed its employees to circulate copies of purchase orders to other units for upcoming importations for proper and smooth entry of merchandise. See Def.'s Ex. C. Also, Ford's internal provisional value policy was meant to ensure that Ford was forthright, rather than subversive with Customs. See id. Moreover, Ford responded to Customs' CF 28s about the subject merchandise rather than ignoring them, albeit often after many months had passed. See e.g., Pl.'s Ex. 113; Def.'s Ex. BBBB; Pretrial Order, Schedule C ¶¶ 13, 15, 20. Ford's CF 28 responses commonly included tenders for unpaid duties. See e.g., Pl.'s Ex.

39.  Such procedures illustrate Ford's intent to comply with the statute.  Without showing that Ford purposefully disregarded its statutory obligations with the intent to defraud the United States, Customs' allegation of fraud fails.  The Court concludes that Customs failed to meet its burden showing that Ford deliberately disregarded its statutory obligations or acted with the requisite intent to defraud the United States.

**B.  Customs Has Established by a Preponderance of the Evidence that Ford's Conduct was Grossly Negligent.**

Gross negligence arises "if it results from an act or acts (of commission or omission) done with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute."  19 C.F.R. pt. 171, App. B(B)(2).  "Wanton" is defined as "unreasonably or maliciously risking harm while being utterly indifferent to the consequences."  BLACK'S LAW DICTIONARY 1613 (8th ed. 2004).  A defendant is liable for a grossly negligent violation of 19 U.S.C. § 1592 "if it behaved willfully, wantonly, or with reckless disregard in its failure to ascertain both the relevant facts and the statutory obligation."  Hitachi I, 21 CIT at 406, 964 F. Supp. at 374 (emphasis retained).  A finding of gross negligence requires the Court to determine that Ford's omissions of information from entry documents and its failure to comply with its statutory obligations was willful, wanton or reckless or that the evidence

before the Court illustrates Ford's utter lack of care.  See <u>Mach.</u>
<u>Corp. of Am. v. Gullfiber AB</u>, 774 F.2d 467, 473 (Fed. Cir. 1985)
(citation omitted).

Gross negligence involves a type of intent which is a question
of fact and not law.  See <u>United States v. Hitachi Am., Ltd.</u>
("<u>Hitachi II</u>"), 172 F.3d 1319, 1326 (Fed. Cir. 1999); <u>see also</u>
<u>Allen</u>, 839 F.2d at 1567.  Customs bears the burden to establish all
the elements of the alleged violation.  See 19 U.S.C. § 1592(e)(3).
Customs must establish such elements by a preponderance of the
evidence, which "is the general burden assigned in civil cases for
factual matters."  <u>St. Paul Fire & Marine Ins. Co. v. United</u>
<u>States</u>, 6 F.3d 763, 769 (Fed. Cir. 1993).  Preponderance of the
evidence is "the greater weight of evidence, evidence which is more
convincing than the evidence which is offered in opposition to it."
<u>Id.</u> (quoting <u>Hale v. FAA</u>, 772 F.2d 882, 885 (Fed. Cir. 1985)).

Negligence is either failure "to exercise the degree of
reasonable care and competence expected from a person in the same
circumstances" or "in communicating information so that it may be
understood by the recipient."  19 C.F.R. pt. 171, App. B(B)(1).
Consequently, negligence does not require the trier of fact to
determine intent.  Section 1592(e)(4) of Title 19 of the United
States Code derogates from common law negligence (<u>i.e.,</u> duty,
breach, causation, and injury) by shifting the burden of persuasion

to the defendant to show lack of negligence. See Hitachi I, 21 CIT at 380, 964 F. Supp. at 355. The statute removes the breach element from Customs' prima facie negligence case. See id. Accordingly, Customs must establish by a preponderance of the evidence that the materially false act or omission occurred. See 19 U.S.C. § 1592(e)(3). Once Customs has met its burden, Ford bears the burden to establish that it exercised reasonable care under the circumstances and that the alleged violation was not caused by its negligence. See 19 U.S.C. § 1592(e)(3); 19 C.F.R. pt. 171, App. B; see also Hitachi I, 21 CIT at 381, 964 F. Supp. at 355-56.

As a threshold issue, Ford asserts that Customs failed to offer into evidence ten of the eleven entry summaries at issue.[6] See Def.'s Post-Trial Br. at 24-26. Ford argues, that without the entry summaries admitted into evidence, the Court has no means of evaluating Customs' claims that the entered values were false or that Ford failed to notify Customs that the prices reflected therein were not final. See id. Ford's argument is flawed because the statutory language contemplates violations where the importer of record has either made material omissions or failed to act. See

---

[6] Ford is actually incorrect. Customs submitted the CF 7501 for entry number 441-3103684-8 as a separate exhibit. See Pl.'s Ex. 26E. Other entry summaries were admitted as parts of other exhibits. See Pl.'s Ex. 113 (including CF 7501s for entry numbers 441-4824795-8 and 441-4823061-6).

19 U.S.C. § 1592(a). An importer may violate the statute by failing to provide Customs with entry documents in the first place. Pursuant to Ford's argument, the government would be precluded from successfully bringing an action pursuant to 19 U.S.C. § 1592 in instances where entry documents or specific entry information was never submitted to Customs. This reasoning is untenable and contradicts the plain meaning of the statutory language.

The totality of the evidence submitted at trial provides the Court with ample evidence of the values Ford declared on its entry documents. Ford admitted that the invoice price stated in the entry documents was the purchase order price, and all the purchase orders are in evidence. See TT at 845; see also Pl.'s Ex. 24, 25, 26E, 71. Furthermore, Ford acknowledged that it did not enter the subject merchandise provisionally or disclose the existence of the 204 engineering purchase orders to Customs until its letter, dated August 6, 1991. See TT at 357; Pl.'s Ex. 39. Accordingly, the Court finds that there is sufficient evidence to evaluate Customs' claims that the entered values were false or that Ford failed to promptly notify Customs that the prices reflected therein were not final.

Based on the evidence submitted, the Court finds that Customs established by a preponderance that Ford's conduct was grossly negligent. Ford failed to account for the value of the engineering

changes when it entered the subject merchandise. On multiple occasions, Ford failed to promptly notify Customs promptly of the value of the engineering purchase orders. This repeated failure constitutes a material omission because the engineering changes had an impact on the dutiable value of the FN-36 dies. Consequently, Ford's knowledge of and repeated indifference for the value of the engineering changes in its submissions to Customs constitutes a wanton disregard of its obligations.

> **1.    Ford's Failure to Include or Notify Customs of the Engineering Changes at Entry was a Material Omission in Violation of 19 U.S.C. § 1484**

Under 19 U.S.C. § 1484, an importer of record has the duty to present true and correct information at entry enabling Customs to properly assess duties on the merchandise. See 19 U.S.C. §§ 1484(a) & 1485 (1988); see also 19 U.S.C. § 1592(a). True and correct information includes, invoices with the purchase price in the currency of the purchase and any other documentation necessary for proper appraisement and classification. See 19 U.S.C. § 1484; see also 19 U.S.C. § 1481(a)(5) (1988); United States v. Thorson Chem. Corp., 16 CIT 441, 448, 795 F. Supp. 1190, 1195 (1992). This duty encompasses an importer's obligation to notify Customs if the values on an entry summary are not final. See Hitachi I, 21 CIT at 387, 964 F. Supp. at 360 (stating that the importer's omission on entry documents of escalation clauses affecting price "had a

potential impact on the correct duty and thus perpetrated a material omission").

During the relevant time, Ford had mechanisms in place to prepare for the entry of the subject merchandise. For example, Ford's internal units had procedures that facilitated the notification of upcoming importations so that each unit could do its job correctly. See e.g., Def.'s Ex. C. Ford also had a provisional value policy designed to transmit information within Ford, to its broker, and ultimately to Customs that the value of certain merchandise would increase after entry. See TT at 228-30, 332, 839-40, 869-71, 1022-24; Def.'s Ex. C. Both pre-entry mechanisms failed to occur with the FN-36 entries, resulting in the wanton disregard for the engineering purchase orders. See TT at 229-30; Pl.'s Ex. at 24, 25, 26E, 113. Ford argues that the compliance mechanisms it had in place illustrates that it was not wanton. See Def.'s Post-Trial Br. at 18-19. Ford cites the following mechanisms in support: instructions to vendors to put "provisional pricing" on invoices; standing instructions to its broker to indicate provisional prices on entries; and a regular filing of a reconciliation of prices and duties to Customs after prices were finalized. See id. at 2. Of the three mechanisms Ford cites, the evidence established that the first two mechanisms failed to occur with respect to the FN-36 entries. The existence

of the third mechanism is not adequately supported by the evidence.[7]    Rather, the minimal mechanisms Ford may have implemented represent an institutional indifference to ensuring that Ford captured and reported the full transaction value of entered merchandise.  Ford failed to include the value of the engineering changes known at the time of entry.  Moreover, Ford knew that the prices declared at entry were not the final dutiable value and failed to notify Customs that such values were subject to change.  Ford's institutional indifference to the existence of the engineering purchase orders constitutes an utter lack of care and therefore, a violation of 19 U.S.C. § 1592.

> **a.   Ford Failed to Include the Value of the Engineering Changes When Entering the FN-36 Dies**

An entry summary is the presentation made by an importer to Customs for entry of merchandise declaring classification numbers, rates of duty, and any supporting documents such as invoices.  See TT at 352-53.  Ford argues that it complied with 19 U.S.C. § 1484 because the prices listed on the invoices in the entry summaries

---

[7]    Mr. Gibson testified that Ford reconciled programs after entry by comparing values declared at entry to Customs against amounts actually paid to the supplier.  If there was a discrepancy, Ford would tender any additional duties owed to Customs.  See TT at 870.  Conflicting evidence was submitted to the Court about when Ford began conducting reconciliations.  See e.g., TT at 875-77 & 884-85; Pl.'s Ex. 2 & 99A.  Therefore, the Court finds that Ford failed to show that it had a reconciliation program in place prior to and during the FN-36 program.

were the only prices known at the time of entry.  See Def.'s Post-
Trial Br. at 11-12.  Ford's argument fails in two ways.  First, the
initial entry for the FN-36 dies was made on February 2, 1989, yet
the initial engineering purchase order was dated November 29, 1988.
See Pl.'s Ex. 25, 69, 113; Pretrial Order, Schedule C ¶ 11.
Accordingly, the Court concludes that Ford knew or should have
known at the time of importation that the value of the FN-36 dies
was not solely the base tool order and amendments.  The entry value
of the FN-36 dies should have included any engineering changes
dated before February 2, 1989.  Ford, however, failed to provide
the true and complete value of the merchandise because it did not
include the engineering changes known prior to entry.

Second, on their face, the purchase orders provide enough
information to cross-reference the base tool order and amendments
to the 204 engineering purchase orders in three different ways.
See Pl.'s Ex. 24 & 25.  First, the 204 engineering purchase orders
begin with tool order T524675, which is dated November 29, 1988.
See Pl.'s Ex. 25.  This tool order unambiguously states that it
replaces amendments 8, 9 & 10 to the base tool order, T510288.  See
id.  Second, amendment 11 to the base tool order has a handwritten
notation that states it is "reissued on T524675," which is the
initial engineering purchase order.  See Pl.'s Ex. 24.  Third and
most significantly, the project number "1D90A00" was printed on the

base tool order, amendments, and most of the engineering purchase orders to track changes and costs made in the FN-36 program.  See TT at 775-76; Kruzich at 19-23; Pl.'s Ex. 24, 25, 105.  A review of purchase orders by project number should have encompassed the base tool order, seventeen amendments, and 204 engineering purchase orders.  Thus, Ford's customs unit should have been able to account for the engineering changes and convey the correct information to its broker for entry.  Ford offered no evidence explaining how its customs unit missed the links between the base tool order and the engineering changes when its accounting unit was able to track all the purchase orders.  See Pl.'s Ex. 99A (internal audit dated April 30, 1991, capturing all the engineering changes).  Accordingly, the Court concludes that Ford exhibited a lack of care and indifference.  Ford ignored the timing and cross-references between all the purchase orders which attributed to the undervaluation of the FN-36 dies.

> **b.    Ford Failed to Use or Check Its Provisional Value Policy Regarding the FN-36 Dies**

Ford contends that it had no legal obligation to enter the dies "provisionally" and did so voluntarily.  See Def.'s Post-Trial Br. at 13.  Ford also argues that the legend on each purchase order, submitted with Ford's CF 28 response dated November 20, 1989, placed Customs on notice that the prices declared at entry were not final.  See id. at 3.  The plain language of the legend,

however, indicates that a final price adjustment could occur in crediting the buyer, i.e. Ford receiving a credit on money paid, which is different from an increase in price that would affect dutiable value. See Pretrial Order, Schedule C ¶ 9; Pl.'s Ex. 24 & 25. Ford's provisional value policy was a mechanism implemented by Ford to satisfy its 19 U.S.C. § 1484 legal obligation. Provisional value would be marked somewhere on the entry documents, either on the invoice or on a separate memorandum to Customs, notifying Customs that the value of the merchandise was not final. See TT at 215-16, 228-30, 332, 839-40, 868-71, 1022-24; Pl.'s Ex. 85 & 86; Def.'s Ex. C. When Customs knew that an entry's value was not final, it would withhold liquidation until the final value was known. See TT at 212-16, 427-28, 493-94. Ford correctly asserts that between 1988 and 1991, there was no Customs regulation or directive requiring an importer to use the words "provisional pricing." See TT at 440, 476, 511, 870. Ford, however, should have known its legal duty under 19 U.S.C. § 1484 to notify Customs if the value at entry was not the complete and final value. See 19 U.S.C. § 1484.

Ford's duty to be forthright on its entry documents remained regardless if Customs was aware of Ford's provisional value policy. Ford was a sophisticated importer. See TT at 964. Moreover, Ford had an internal provisional value policy and had marked entries as

provisional before. See Pl.'s Ex. 85 & 86; Def.'s Ex. C. Ford understood that it had an obligation to notify Customs if the price at entry was not complete. See Kruzich at 40-42. Otherwise Ford would not have implemented its provisional value policy. The evidence demonstrated that automotive dies were a type of merchandise that Ford historically marked as provisional because it knew the price would usually change after entry. See e.g., TT at 868, Pl.'s Ex. 85, 86, 107; Def.'s Ex. C. Ford should have notified Customs that the price stated on the entry summaries was not final because Ford knew that the price of the dies did not include the engineering changes or the price was bound to increase. Ford failed to mark the subject entries as provisional. See TT at 229-30; Pl.'s Ex. 26E & 113. This was a direct failure and lapse of Ford's provisional value policy, and a material omission affecting Customs' ability to assess duties correctly.

There was a lack of communication among the Ford units about how and when to apply its provisional value policy. See TT at 705-06, 779-80, 827-29; Pl.'s Ex. 2. With respect to the 204 engineering purchase orders omitted from the entry documents, there was a failure within Ford's purchasing unit to transmit copies of these purchase orders to the other Ford units and the broker. See Pl.'s Ex. 105; see also TT at 163-73; Pl.'s Ex. 2. No witness explained why the 204 engineering purchase orders were either not

received by Ford's customs unit or not included in dutiable costs. The only explanation given by Ford was that an internal computer system caused all the engineering purchase orders to be separately numbered rather than issued as amendments to the base tool order. See TT at 167-68; Pl.'s Ex. 2, 99, 105. Ford's explanation, however, is not reasonable. Ford should have had control mechanisms in place to ensure that its provisional value policy was being implemented or used properly. Without any control mechanisms, Ford's behavior exhibits an indifference to whether its provisional value policy was being implemented or not defeating its purpose.

Ford's failure to follow its provisional value policy also affected Ford's communications to its broker. Ford did not formalize its provisional entry policy with its broker until November 1991, well after the subject entries. See TT at 247 & 332; Pl.'s Ex. 107. In early 1989, when the FN-36 dies were entered, Ford's policy was to tell its broker to enter certain merchandise provisionally on a case by case basis. See TT at 228-30, 839-40, 869-71. Ford would convey this request through verbal or written communication, but did not have a set practice. See TT at 869-71 & 992. Even if the broker received copies of the engineering purchase orders per Ford's policies, the broker would not have known to enter any merchandise provisionally unless specifically instructed to do so by Ford. More importantly, Ford

did not have post-entry mechanisms in place to verify that the information the broker submitted to Customs was true and correct. See TT at 824-25; Pl.'s Ex. 40 & 99. Ford's failure to have a clear policy with its broker on when to use provisional value and its failure to verify information submitted by its broker exhibits Ford's indifference to satisfying its Customs obligations. Ford did not present evidence that it took any steps to ensure the use of its policy, internally or with its broker. Thus, Ford's failure to implement or check its provisional value policy demonstrates an indifference amounting to gross negligence.

### 2. Ford's Failure to Notify Customs "At Once" of the Engineering Purchase Orders was a Material Omission in Violation of 19 U.S.C. § 1485

Pursuant to 19 U.S.C. § 1485(a), an importer "will produce at once to the appropriate customs officer any invoice, paper, letter, document, or information received showing that any such prices or statements are not true or correct." 19 U.S.C. § 1485(a)(4) (emphasis added). The statute obligates importers to immediately report to Customs any new information showing that the prices declared at entry were incorrect. See Hitachi I, 21 CIT at 382, 964 F. Supp. at 356. In Hitachi, an escalation clause in the contract gave rise to a possible post-entry increase in the value of the imported merchandise. See id. at 371, 964 F. Supp. at 344. The importers failed to disclose the escalation clause on any of

the entry documents, or later when it made payments under the escalation clause. See id. The Court found this failure to be in violation of 19 U.S.C. §§ 1484 and 1485. See id. at 381-82, 964 F. Supp. at 356. Under 19 U.S.C. § 1485, an importer must notify Customs of post-entry payments affecting dutiable value "at once" unless other arrangements have been made. Cf. id. at 390, 964 F. Supp. at 362-63. Ford failed the 19 U.S.C. § 1485 "at once" duty when it 1) failed to fully answer Customs' CF 28s, and 2) failed to promptly disclose the information contained in its internal audit of the FN-36 program.

### a.    Ford Failed to Fully Answer Customs' CF 28s

The testimonial and documentary evidence established that Ford did not have any procedures in place to compare information filed with Customs against purchase orders or payment records unless a CF 28 was issued by Customs. See TT at 821-32; Kruzich at 42-45; Pl.'s Ex. 40 & 99. A Customs CF 28 was a request for information sent to importers when Import Specialists had questions regarding an entry. TT at 347 & 825-26. Various Ford employees knew a problem existed between Ford's customs and purchasing units regarding advance notice of upcoming importations because Ford's customs unit would "discover" purchase orders when answering CF 28s. See TT at 821-32; Kruzich at 29-45. In some instances, the issuance of a CF 28 was the first time Ford's customs unit even

learned that an entry had been made.  See TT at 821-32; Kruzich at 42-45.  Ford's customs unit, however, did not advise the purchasing unit supervisors of this issue, thus nothing was done to remedy the problem.  See Kruzich at 44-45.  The evidence further demonstrated that the accepted practice at Ford was to wait for Customs to issue a CF 28 as a means of checking whether or not Ford had properly declared all dutiable values at entry.  See TT at 823-30 & 850-52; Kruzich at 27-45; Pl.'s Ex. 40 & 99.

Ford had numerous opportunities to advise Customs of the 204 engineering purchase orders each time it responded to a CF 28.  Testimonial evidence explained that Customs had a practice of accepting prior disclosures in CF 28 responses.  See TT at 496-97.  While CF 28s are routine, Ford did not take them very seriously, and made minimal efforts to respond.  See TT at 826-29 & 851-52.  Customs issued CF 28s for seven of the eleven subject entries, to which Ford substantively responded only to two.  See Pl.'s Ex. 29, 30, 31, 32; Def.'s Ex. BBBB.  The documentary evidence shows that of the two substantive CF 28 responses Ford submitted, the earliest response was eight months after the CF 28 was originally issued.  See Def.'s Ex. BBBB.  The other CF 28 response was twenty-six months after Customs initially issued the CF 28.  See Pl.'s Ex. 31 & 32.

In answering the CF 28s, Ford should have compiled all the information it had about the inquired entry number and attempt to answer each CF 28 completely and thoroughly. If Ford had thoroughly answered each CF 28, a search by project number would have revealed the engineering purchase orders because all the purchase orders had the same project number ("1D90A00") on them. Of Ford's two substantive CF 28 responses, both failed to disclose the engineering changes and their affect on the dutiable value of the FN-36 dies. Ford's CF 28 response dated November 20, 1989, references the base tool order and sixteen amendments for the FN-36 dies. See Def.'s Ex. BBBB. The cost for the FN-36 dies stated in the letter was $67,834,926, which was also the amount listed on amendment 16. See Pl.'s Ex. 24; Def.'s Ex. BBBB. Again, the engineering purchase orders were first dated November 28, 1988. See Pl.'s Ex. 25. Had Ford's response been complete, it should have reported the 204 engineering purchase orders to Customs in its November 20, 1989, response as a prior disclosure. Ford's CF 28 response dated May 6, 1991, stated that final audit results were not yet available and requested an additional thirty days to respond. See Pl.'s Ex. 32. Ford's customs unit was aware of an internal audit, see TT at 879-81 & 942-43, yet, Ford still did not disclose the engineering purchase orders to Customs until August 6, 1991, after a summons had been issued. See Pl.'s Ex. 38 & 39. Ford's May 23, 1991, response only asked for an extension to

"confirm that final audit and price adjustments are in agreement" with its final CF 28 response.  Def.'s Ex. Y.  For the remaining four CF 28s, Ford first asked for an extension and then informed Seattle Customs that it would be directing its responses to Detroit Customs because of the June 6, 1991, summons.  See Pl.'s Ex. 31 & 54.

In each of Ford's CF 28 responses to Customs, Ford had enough knowledge to disclose the engineering purchase orders but failed to utilize the opportunity.  The Court concludes that Ford's reliance on Customs' practice of sending CF 28s is not a valid excuse for its failure to declare full value at entry or to notify Customs that the invoice price was not final.  Cf. United States v. Nippon Miniature Bearings, Corp., 25 CIT 638, 641, 155 F. Supp. 2d 701, 705 (2001) (burden is on the importer to provide true and accurate information to Customs, and not on Customs to ferret out those importers not in compliance).  Again, Ford's continual and systematic indifference to the existence of the engineering purchase orders and their affect on dutiable value constitutes grossly negligent conduct.

### b.    Ford Did Not Disclose the Information Contained in Its Internal Audit "At Once"

The only evidence presented to the Court of a post-entry mechanism that accounted for all the FN-36 costs was an internal

audit completed by Ford on April 30, 1991. See Pl.'s Ex. 99A. For each engineering order, the internal audit broke down the work attributable to OIW and to OAC. See Pl.'s Ex. 99A. This information was important because work completed by OIW in Japan increased the dutiable value of the FN-36 dies. While Customs knew that Ford was conducting an internal audit, Customs had no information as to the scope of the audit or if the audit would affect dutiable value of the subject entries. See Pl.'s Ex. 32 & 97; Def.'s Ex. Y. Ford had informed Customs that it was conducting an internal audit on March 8, 1991. See TT at 115-19; Pl.'s Ex. 97. Also, in its May 6, 1991, CF 28 response to Seattle Customs, Ford used the audit as an excuse to request additional time. See Pl.'s Ex. 32. Merely notifying Customs that an internal audit was taking place, however, did not provide Customs with the information it had requested to determine whether correct prices had been declared on the entry summaries. Therefore, Customs was not able to calculate proper duties.

Furthermore, the Court finds that Ford knew the values of the engineering purchase orders before its audit was published on April 30, 1991. Ford, for example, issued amendment 17 to the base tool order, dated January 16, 1991, for an audit reduction of $1,758,966. See Pl.'s Ex. 24. Customs, however, did not receive amendment 17 until seven months later, as part of Ford's August 6,

1991, letter which also disclosed the 204 engineering purchase orders. See Pl.'s Ex. 39. Neither amendment 17 nor the attachments to Ford's August 6, 1991, letter explain the audit reduction. See Pl.'s Ex. 24, 39. The Court finds that Ford's failure to disclose its internal audit results "at once" is another example of its indifference and lack of care to fulfill its Customs obligations.

When Ford finally informed Customs for the first time of the existence of the 204 engineering purchase orders, it did so in a letter dated August 6, 1991. See Pl.'s Ex. 39; see also TT at 357. The letter merely listed the engineering purchase orders and the amount of each, but lacked information about which Ogihara company completed the work. See Pl.'s Ex. 39. Ford again did not disclose the relevant information contained in its internal audit to Customs. This information would have helped Customs determine which engineering changes affected the dutiable value of the FN-36 dies. Rather, the contents of Ford's internal audit results were not revealed to Customs until after the Pre-Penalty Notice was issued in 1994. See TT at 641-46; Pl.'s Ex. 41 & 43. Testimony at trial established that Ford's internal audit was submitted after Customs published its own audit of the FN-36 program on July 6, 1992. See TT at 641-42. Therefore, Ford's internal audit was not used by Customs in its audit, however, Ford had submitted other

documents to Customs during their audit.  See TT at 630-31; Pl.'s Ex. 40.  The information contained in Ford's audit about which Ogihara company had done the various engineering changes would have been very relevant to Customs' audit in determining the value of the FN-36 dies.  Ford's failure to notify Customs of the changes to the value of the FN-36 dies upon completion of Ford's internal audit violated the "at once" duty of 19 U.S.C. § 1485.

Ford's indifference to the engineering purchase orders is illustrated by the gross failure of its provisional value policy and the lapse of communication between its internal units.  Ford also had opportunities to disclose the existence of the 204 engineering purchase orders to Customs in CF 28 responses and repeatedly failed to do so until after Customs issued a summons. Repeated neglect of a legal duty rises to indifference and an utter lack of care.  Based on the evidence presented, the Court finds that Ford's indifference to its duty to disclose "at once" the value of the engineering changes constitutes grossly negligent conduct in violation of 19 U.S.C. § 1485.

### C.    Ford Did Not Make a Valid Prior Disclosure

The maximum penalty an importer may be assessed is significantly reduced if the importer makes a prior disclosure revealing the facts and circumstance relating to a violation.  See 19 U.S.C. § 1592(c)(4).  To make a prior disclosure, the person

concerned must disclose the circumstances of a violation before, or without knowledge of, the commencement of a formal investigation and make a tender of any actual loss of duties.  See id.; 19 C.F.R. § 162.74(a) (1991).  A violator "discloses the circumstances of the violation" by providing Customs with a written statement which: (1) identifies the class or kind of merchandise involved; (2) identifies, by entry number or by the port of entry and approximate dates of entry, the importation included in the disclosure; (3) specifies the material omission or false statement made at entry; and (4) sets forth the true and accurate information or data which should have been provided in the original entry documents.  See 19 C.F.R. § 162.71(e).  A formal investigation is considered to be commenced on the earliest of the following: (1) the date recorded in writing in the investigatory record, including contemporaneous notes, as the date upon which an agent believed the possibility of a violation existed; (2) the date an investigating agent properly identified herself or himself and the nature of her or his inquiry, in writing or in person and inquired about the disclosed violation; or (3) the date an investigating agent, after properly identifying herself or himself and the nature of her or his inquiry, requested specific books and records relating to the disclosed violation. See 19 CFR § 162.74(d)(4).  Furthermore, if before the claimed prior disclosure a person is informed of "the type of or circumstances of the disclosed violation," then the person is

"presumed to have had knowledge of the commencement of a formal investigation." 19 C.F.R. § 162.74(f). This presumption, however, may be defeated with evidence that the person did not know an investigation had commenced with respect to the disclosed information. See id.

### 1. Customs Commenced Its Investigation of the FN-36 Program by March 8, 1991.

The evidence established that Ford did not make a prior disclosure because Customs was already investigating the FN-36 dies and Ford knew or should have known it was being investigated by the time it disclosed its violations. Customs began its investigation of Ford as an outgrowth of the OAC investigation. See TT at 82-85 & 268; Pl.'s Ex. 33; Def.'s Ex. YYY & ZZZ. Customs argues that it commenced its investigation in October 1990 when Mr. Turner met Mr. Gibson. See Pl.'s Post-Trial Br. at 22-23. Ford counters that Customs did not commence its investigation until August 21, 1991. See Def.'s Post-Trial Br. at 22-23. The October 1990 meeting is recorded in OAC ROI # 8, and is described in a few short sentences.[8] See Pl.'s Ex. 33. Several pages of the ROI recount meetings Mr. Turner had with GM indicating that his focus was on

---

[8] In some situations, the presence of a special agent and what transpired at the meeting may indicate that an investigation has commenced. Given the length of time since the events in question, however, the Court relies on the documentary evidence to corroborate the testimony of Messrs. Turner, Neckel, and Gibson.

GM's interactions with OAC at that time.  See id.  Both Messrs. Neckel and Turner stated that Ford was under investigation by late 1990, see TT at 339-40 & 536, but the documentary evidence simply does not satisfy 19 C.F.R. § 162.74(d)(4) to sustain such a finding.  Therefore, the Court concludes that Ford was not being investigated in October 1990 because of the minimal contemporaneous notes recording the events that transpired therein.

Based on the evidence, the Court concludes that Mr. Turner suspected a violation, regarding Ford, may have existed by March 8, 1991.  An investigating agent is required to put a date in writing, in the investigative record including contemporaneous notes, when she or he received or discovered information causing her or him to believe the "possibility" of a 19 U.S.C. § 1592 violation existed. See 19 C.F.R. § 162.74(d)(4)(i).  On March 8, 1991, Mr. Turner received information that Ford was compiling previously requested documents regarding Ogihara and the FN-36 dies and that Ford was conducting an internal audit. See TT at 109, 115-19, 316, 894-96; Pl.'s Ex. 97.  Mr. Turner's dated notes are a part of the investigative record, and mention dies; entries in Seattle, Detroit, and Los Angeles; and an internal audit at Ford. See Pl.'s Ex. 97.  The regulations require that Customs record a date in writing in the investigative record, which specifically includes contemporaneous notes, and Mr. Turner did so with his notes of

March 8, 1991.  Accordingly, Ford's argument that Customs did not commence its investigation until August 21, 1991, fails.  See Def.'s Post-Trial Br. at 22-23.  If there was still any doubt, the arrival of a Customs summons on June 7, 1991, should have alerted Ford an investigation was underway.  Pursuant to 19 CFR § 162.74(d)(4)(i), the Court finds that Mr. Turner's notes along with the trial testimony established that by March 8, 1991, Customs had commenced its investigation of Ford.

### 2. Ford Knew or Should Have Known of the FN-36 Investigation by June 7, 1991 and Failed to Disclose Its Violation Until August 6, 1991

Ford knew or should have known that it was being investigated by June 7, 1991, when Customs issued a summons for the FN-36 program.  See TT at 126-31, 540-41, 600-01; Pl.'s Ex. 38 & 112.  A person may still receive prior disclosure treatment if the disclosure was made prior to knowledge of the investigation.  See 19 U.S.C. § 1592(c)(4); 19 C.F.R. § 162.74(f).  A party claiming lack of knowledge of the commencement of an investigation has the burden to prove that lack of knowledge.  See 19 C.F.R. § 162.74(f).  Based on the evidence, the Court finds that Ford failed to prove its lack of knowledge.

The June 7, 1991, summons requested documents from Ford regarding the FN-36 dies and was very expansive in scope.  See Pl.'s Ex. 38.  Ford should have known that it was no longer a

potential witness in OAC's investigation, but had become a target of a Customs investigation itself. To deliver the summons, Messrs. Turner and Neckel met with Mr. Gibson and other Ford representatives. See TT at 130-31, 541-42, 881-82; Pl.'s Ex. 112. Ford did not offer persuasive evidence that it did not know about Customs' investigation after the June 7, 1991, summons was issued. Therefore, the Court concludes Ford knew or should have known that it was being investigated by June 7, 1991.

Ford's letter dated August 6, 1991, revealed the existence of 204 engineering purchase orders for the first time to Customs.[9] See Pl.'s Ex. 39; see also TT at 131-38, 355-57, 627-28; Pl.'s Ex. 74. This letter is the only communication that could qualify as a prior disclosure. The letter disclosed the circumstances of Ford's violation because it was a written statement, identifying the merchandise and entry number involved, disclosed the engineering purchase orders, and explained how they affected the dutiable value of the subject entries, thereby satisfying 19 C.F.R. § 162.71(e). The violation addressed in the letter was the material omission of the engineering purchase orders which affected the value of the FN-

---

[9] The August 6, 1991, letter also claimed that the engineering purchase orders were "discovered" in April 1991 because they were not cross-referenced to the base tool order. The Court is not persuaded by this claim. Again, all the purchase orders (base tool order, seventeen amendments, and engineering changes) had the same project number on them, precisely so that they could be tracked and cross-referenced.

36 dies and ultimately the duty owed.  See Pl.'s Ex. 39.  Ford also tendered unpaid duties on November 22, 1991, as required by19 C.F.R. § 162.74(a).  See Pl.'s Ex. 39; Def.'s Ex. BB.

Customs commenced its investigation of Ford by March 8, 1991. Since Ford had knowledge of the investigation by June 7, 1991, and did not disclose the engineering purchase orders until August 6, 1991, the Court concludes that Ford failed to make a disclosure prior to its knowledge of the investigation.  Therefore, Ford did not satisfy the requirements under Customs' regulations for prior disclosure treatment.

**D.    Appraisement of Merchandise and Loss of Revenue**

Pursuant to 19 U.S.C. § 1592(d), the United States may collect any lawful duties owed resulting from a 19 U.S.C. § 1592(a) violation notwithstanding 19 U.S.C. § 1514 (finality of liquidations) whether or not a monetary penalty is assessed.  See 19 U.S.C. § 1592(d).  The Court must determine the loss of revenue. See 19 U.S.C. § 1592(e).  Pursuant to 19 U.S.C. § 1401a(a)(1)(A), imported merchandise is appraised at the transaction value, which is the "price actually paid or payable" plus other enumerated costs.  See 19 U.S.C. §§ 1401a(a) & (b) (1988).

Customs' Regulatory Audit reviewed the values for the engineering changes submitted by Ford in its August 6, 1991, letter

and determined that Ford underdeclared the value of the FN-36 dies by $16,816,296 and owed $689,775 for unpaid duties. See Pl.'s Ex. 40. After the Pre-Penalty Notice, dated January 10, 1995, Ford made submissions requesting reappraisal of the value and loss of revenue. See Pl.'s Ex. 41, 43. As a result of the reappraisal, Customs' Penalty Notice stated a revised appraisal value of the FN-36 dies as $84,393,564. See Pl.'s Ex. 43. Thus, Customs determined that Ford had not declared $21,314,111 in value. See id. Customs calculated a loss of revenue in duties to the United States of $874,270, of which $184,495, was unpaid. See id. The unpaid duty of $184,495, is the remaining loss of revenue sought by Customs in this action.

Ford argues that the FN-36 dies were only undervalued by $6,697,291 and Customs' total loss of revenue was $274,588.93. See Def.'s Post-Trial Br. at 28-30. Ford further states that because Customs only introduced one of the twelve entry summaries into evidence, the loss of revenue must be apportioned pro rata over all the entries. See id. at 30. Thus, Ford argues the loss of revenue for the admitted entry summary is $39,760.48. See id. The Court has already determined that there is substantial evidence establishing the prices Ford stated on its entry summaries. Accordingly, the Court finds Ford's argument is without merit.

Ford argues that it submitted evidence of various adjustments

in support of its proposed valuation. See Def.'s Post-Trial Br. at 28-30. These adjustments include: United States costs paid to third party vendors, audit credits, FN-36 entries made by OAC, and entries of FN-36 functional panels. See id. The Court finds that Ford has failed to show that such adjustments were part of the price actually paid or payable for the FN-36 dies. Ford's proposed United States costs paid to third party vendors do not have a sufficient indicia of reliability that they were included in the cost of the FN-36 dies. See Def.'s Ex. III. Ford's proposed audit credits include an audit adjustment that was listed on amendment 17 to the base tool order, which was captured in Customs' Regulatory Audit report. See Pl.'s Ex. 40; Def.'s Ex. KKK. Ford also proposed an audit credit payment made on Ford's FN-10 program, which is unrelated to the FN-36 program and not sufficiently explained by Ford. See Def.'s Ex. KKK. The third adjustment Ford claims is for FN-36 entries made by OAC, which are not relevant because Ford was not the importer of record for these entries. See CCC, EEE, FFF. The fourth adjustment claimed is for entries of FN-36 functional panels, imported by Ford, see Def.'s Ex. PP, Collective Def.'s Ex. QQ, which do not clearly indicate that they are part of the FN-36 dies. Ford claims that the functional panels were purchased under amendment 15 to the base tool order. See Def.'s Post-Trial Br. at 29-30. The Court, however, is not persuaded by testimony and there is no supporting link between the

tooling breakdown description on amendment 15 and the functional panels. See TT at 788-91; Pl.'s Ex. 24; Def.'s Ex. PP, Collective Def.'s Ex. QQ. Customs considered various adjustments that Ford proposed and revised its numbers for the undeclared value and loss of revenue. See Pl.'s Ex. 43. The adjustments that Ford claims do not establish a truer value of the FN-36 dies.

Ford also argues that it is entitled to recoup any overpayments it has made to reduce or satisfy any loss of revenue and/or penalties assessed in its counterclaim.[10] See Def.'s Post-Trial Br. at 30-31. The Court, however, finds that Ford's appraisement is incorrect and no overpayment exists. Therefore, Ford's counterclaim is dismissed. Based on the documentary and testimonial evidence, the Court determines that Ford undervalued the FN-36 dies by $21,314,111, the loss of revenue to the United States was $874,270, and Ford owes $184,495 for unpaid duties.

### E.    Assessment of Penalties

For grossly negligent violations of 19 U.S.C. § 1592(a), the maximum penalty is the lesser of the domestic value of the merchandise or four times the loss of duties. See 19 U.S.C. § 1592(c)(2); see also 19 C.F.R. § 162.73(a)(2). The plain language

---

[10]    Ford derives its overpayment of $415,186.07 from the $689,775 tendered to Customs on November 22, 1991, minus its loss of revenue calculation of $274,588.93. See Def.'s Post-Trial Br. at 31.

of the statute only sets maximum penalties and does not establish minimum penalties, nor does it require the Court to begin with the maximum and reduce that amount in light of mitigating factors. See United States v. Modes, Inc., 17 CIT 627, 635, 826 F. Supp. 504, 512 (1993). The court "possesses the discretion to determine a penalty within the parameters set by the statute." See id. at 636, 826 F. Supp. at 512 (citations omitted). This court has identified a number of factors to be considered when assessing a penalty in Modes, 17 CIT at 636, 826 F. Supp. at 513 and United States v. Complex Mach. Works Co., 23 CIT 942, 949-50, 83 F. Supp. 2d 1307, 1315 (1999). Those factors are:

1. The defendant's good faith effort to comply with the statute
2. The defendant's degree of culpability.
3. The defendant's history of previous violations.
4. The nature of the public interest in ensuring compliance with the regulations involved.
5. The nature and circumstances of the violation at issue.
6. The gravity of the violation.
7. The defendant's ability to pay.
8. The appropriateness of the size of the penalty to the defendant's business and the effect of a penalty on the defendant's ability to continue doing business.
9. That the penalty not otherwise be shocking to the conscience of the Court.
10. The economic benefit gained by the defendant through the violation.
11. The degree of harm to the public.
12. The value of vindicating the agency authority.
13. Whether the party sought to be protected by the statute had been adequately compensated for the harm.
14. And such other matters as justice may require.

See Complex Mach., 23 CIT at 949-50, 83 F. Supp. 2d at 1315 (citing Modes, 17 CIT at 636, 826 F. Supp. at 513; United States v. Ven-

<u>Fuel, Inc.</u>, 758 F.2d 741, 764-65 (1st Cir. 1985)(applying an earlier version of 19 U.S.C. § 1592)). The first ten factors relate to deterrence, the next three are public policy concerns, and the final factor is a general discretion provision. <u>See</u> <u>Complex Mach.</u>, 23 CIT at 950, 83 F. Supp. 2d at 1316. Given the clear Congressional preference for deterrence, the Court will, give more weight to the deterrence factors than the public policy factors. <u>See</u> <u>id.</u> Under 19 U.S.C. § 1592(c), the maximum penalty is the lesser of four times the loss of revenue or the domestic value of the merchandise. <u>See</u> 19 U.S.C. § 1592(c). The lawful duty which the United States was deprived of is $874,270, considerably less than the domestic value of the merchandise, which is approximately $84 million. <u>See</u> Pl.'s Ex. 43. The maximum penalty the Court may assess is $3,497,080, four times $874,270. Based on an analysis of the deterrence and public policy factors, the Court determines that $3,000,000 represents a just penalty in this case.

### 1.  Analysis of the Deterrence Factors Place Ford in the Higher Range of Potential Penalties

Of the deterrence factors, the first three are indicia of the defendant's character. <u>See</u> <u>Complex Mach.</u>, 23 CIT at 950, 83 F. Supp. 2d at 1316. Ford's practices and procedures when entering the FN-36 dies indicates a minimal good faith effort in complying with the statute. Ford was a large sophisticated importer making

hundreds of entries each year, and had intimate experience with the Customs laws. See TT at 964. Here, however, Ford blatantly failed to follow its provisional value policy, internally and with its broker; failed to account for and promptly report the engineering purchase orders to Customs; and had no mechanisms in place to verify whether all dutiable values had been reported to Customs. In slight mitigation, Ford had internal customs policies with manuals and training videos to apprise its employees of Ford's statutory obligations. See e.g., Def.'s Ex. C, D, F, G, H, M. While Ford made an effort to comply with Customs' obligations, Ford did not have mechanisms in place to check whether its policies were working. Good faith cannot merely be the appearance of an effort before entries are made, but also must encompass post-entry procedures to ensure effectiveness. Ford's conduct rises to an indifference that cannot be characterized as a good faith effort to fulfill its Customs obligations truthfully and correctly.

Ford is also highly culpable. Ford was systematically indifferent to properly declaring the value of the engineering purchase orders. Ford states that its failure to issue the purchase orders as amendments to the base tool order was "to expedite work to meet the launch date of the FN-36." Pl.'s Ex. 105. Regardless, Ford had the burden to ensure that all dutiable values were captured and declared to Customs upon entry or "at

once" after receiving knowledge that the value had changed. See 19 U.S.C. §§ 1401a, 1484, 1485. Ford's conduct related to the importation of the FN-36 dies implies an internal problem at Ford from 1988 through 1991, which is also evidenced by Ford's multiple Customs violations during the same period. At trial, documentary and testimonial evidence established that Ford was being investigated for other violations occurring contemporaneously to the FN-36 investigation. For example, the primary purpose of Ford's meeting with Seattle Customs in late 1990 was to finalize Ford's penalties in an unrelated Fuji dies case. See TT at 872-74 & 897. Ford was also being investigated on whether it had declared all of its assists and indirect payments for vehicles and vehicle components. See Def.'s Ex. CCCC. Customs' audit report of the FN-36 program also included an audit of Ford's Tempo project, and concluded a loss of revenue in that project. See Pl.'s Ex. 40. Overall, during the subject entries, Ford exhibited an indifference to whether its minimal procedures were carried out correctly, which weighs towards a heavier penalty.

The fourth through sixth factors speak to the seriousness of the offense. See Complex Mach., 23 CIT at 950, 83 F. Supp. 2d at 1316. The public interest at issue is the accurate submission of documentation to Customs and the prompt disclosure of information that affects the proper assessment of duties required on imported

merchandise.  "These are weighty interests, contravention of which necessitates the imposition of a penalty of some substance."  Id. at 952, 83 F. Supp. 2d at 1317.  The nature and circumstances of the violations at issue present a picture of repeated indifference to reporting the engineering purchase orders resulting from poor internal systems designed to ensure proper compliance with Customs laws.  Ford repeatedly missed opportunities to correct the value of the FN-36 dies.  The nature and the circumstances surrounding Ford's entry of the subject merchandise weighs heavily in favor of a significant penalty.  The gravity of the violation may be considered in terms of frequency of the violations, amount of duties lost to the United States, and the domestic value of the imported goods.  See id. at 953, 83 F. Supp. 2d at 1317.  Here, Ford failed to properly account for the engineering purchase orders and repeatedly failed to disclose them to Customs. The final domestic value of the FN-36 dies was $84,393,564.  See Pl.'s Ex. 43 & 75.  The duties evaded totaled $874,270, of which $184,495 remains unpaid.  See id.  Thus, the gravity of the violation is serious and supports a significant penalty.

The seventh, eighth, and ninth factors go to the practical effect of the imposition of the penalty. See Complex Mach., 23 CIT at 950, 83 F. Supp. 2d at 1316.  Given that the maximum possible penalty is $3,497,080, no evidence was presented to the Court

showing Ford's inability to pay the maximum amount.  The maximum penalty is appropriate considering the little effect it will likely have on Ford's ability to continue doing business.  Furthermore, given that the FN-36 dies were valued over $84,000,000, the amount of the maximum penalty pales in comparison and is not shocking to the conscience.

The tenth factor considers the economic benefit gained by the importer through the violation.  See id.  The parties presented no evidence related to this factor.  Circumstantially, however, Ford stated that the engineering purchase orders were numbered separately from the base tool order for expedition so that the dies could be shipped to Michigan.  See Pl.'s Ex. 105.  A delay in the shipment of the dies would have set back production of the 1990 Lincoln Town Car and cost Ford lost profits.  See id.  Thus, the Court will weigh the economic benefit gained by Ford in considering the appropriate penalty.

### 2.    The Public Policy Factors Also Weigh Against Ford

While the first ten factors relate to deterrence, the eleventh, twelfth, and thirteenth factors are public policy concerns which "consider compensation for harm to society."  See Complex Mach., 23 CIT at 950, 83 F. Supp. 2d at 1316.  While deterrence is the weightier concern when imposing 19 U.S.C. § 1592 penalties,  see id., the public policy concerns are also important

and weigh against Ford.  The amount of harm suffered to the public is not limited to the dollar value of the duties lost, but can also be the depletion of government resources in investigation and enforcement of an importer's violations.  See id. at 955, 83 F. Supp. 2d at 1319 (citations omitted).  Customs has expended significant resources and man hours investigating Ford's violations.  The value of vindicating agency authority is also important.  Importers should not let their Customs obligations go to the wayside as Ford did here.  "The penalty must be high enough to deter others from committing these customs violations."  See id. at 956, 83 F. Supp. at 1310.  In totality, analysis of the public policy factors also weigh against Ford and are accordingly considered in the penalty.

After careful consideration of the evidence and testimony presented at trial, the Court has determined that the penalty imposed upon Ford must be a substantial one.  The Court, however, chooses not to impose the maximum penalty of $3,497,080.  Rather, based on the foregoing analysis, the Court determines that $3,000,000 represents a just penalty in this case.

**CONCLUSION**

The Court finds that Customs has established all the elements of 19 U.S.C. § 1592 proving that Ford's conduct in entering the FN-36 dies was grossly negligent.  Ford violated 19 U.S.C. § 1484 by failing to include the engineering changes in the FN-36 prices declared at entry and to notify Customs that the price listed on the entry documents was not the full and final price of the dies through its provisional value policy.  Ford also violated 19 U.S.C. § 1485 by failing to disclose value of the 204 engineering purchase orders "at once."  Ford knew it had communication problems among its internal units and did not have sufficient post-entry mechanisms to catch all dutiable costs, which together illustrate a reckless disregard for its Customs obligations.  Furthermore, Ford does not qualify for prior disclosure treatment because Customs had already commenced its investigation of Ford when Ford finally disclosed the 204 engineering purchase orders in its August 6, 1991, letter.  Ford's grossly negligent conduct led to an undervaluation of the FN-36 dies by $21,314,111.  The United States was deprived $874,270 for lawful duties, of which $184,495 remains unpaid.  Considering the gravity of Ford's conduct and possible mitigating factors, the Court determines that $3,000,000 represents a just penalty in this case.  The Court accordingly grants judgment

for plaintiff, and orders Ford to tender $184,495 for unpaid duties, and assesses Ford a civil penalty in the amount of $3,000,000, plus lawful interest.


                                        /s/ Nicholas Tsoucalas
                                        NICHOLAS TSOUCALAS
                                        SENIOR JUDGE


Dated: July 20, 2005
       New York, New York