# United States Court of Appeals for the Federal Circuit

05-1593

UNITED STATES,

Plaintiff-Appellee,

v.

FORD MOTOR COMPANY,

Defendant-Appellant.

David A. Levitt,Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for plaintiff-appellee.  With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel on the brief were Kathleen Bucholtz and Katherine F. Kramarich, Attorneys, Office of Associate Chief Counsel, United States Customs and Border Protection, of Chicago, Illinois.

Vincent J. Colatriano, Cooper & Kirk, PLLC, of Washington, DC, argued for defendant-appellant.  With him on the brief were Charles J. Cooper, David H. Thompson, Nicole Jo Moss, and Stefan Shibani.  Of counsel on the brief were Robert B. Silverman, David M. Murphy, and Frances P. Hadfield, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, New York, New York; and Paulsen K. Vandevert, Ford Motor Company, of  Deaborn, Michigan.

Appealed from:  United States Court of International Trade

Senior Judge Nicholas Tsoucalas

# United States Court of Appeals for the Federal Circuit

05-1593

UNITED STATES,

Plaintiff-Appellee,

v.

FORD MOTOR COMPANY,

Defendant-Appellant.

_____

DECIDED:  August 30, 2006

_____

Before NEWMAN, RADER, and GAJARSA, <u>Circuit Judges</u>.

GAJARSA, <u>Circuit Judge</u>.

Ford Motor Company appeals from a decision of the United States Court of International Trade holding Ford liable for grossly negligent misrepresentation of the value of import entries and imposing a penalty of $3,000,000, plus interest.  <u>United States v. Ford Motor Co.</u>, 387 F. Supp. 2d 1305 (Ct. Int'l Trade 2005) ("<u>Gross Negligence Decision</u>").  Ford timely filed a notice of appeal on September 14, 2005.  We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).  For the reasons stated herein, we affirm in part and reverse in part.

BACKGROUND

This is the second of two similar appeals involving Ford's import practices. A discussion of the general legal background appears in our decision, issued today, in United States v. Ford Motor Co., No. 05-1584, (Fed. Cir. August 30, 2006) ("Ford I").

This action involves duties paid on manufacturing tooling and stamping dies for the 1990 Lincoln Town car, known internally as the "FN-36" program. Ford imported those dies from Ogihara America Corporation ("OAC"), the American subsidiary of a Japanese company, Ogihara Iron Works ("OIW"). OIW built the dies in Japan and shipped them to its subsidiary OAC's Michigan plant. The initial "tooling purchase order" between Ford and OAC, dated May 27, 1987, specified a total purchase value of $42,544,884.

Over the following four years, as a result of design changes, Ford issued 17 amendments to the base tool order and more than 200 separate "engineering change tool orders." The amendments raised the total price from $42,544,884 to $66,075,960. Of the 17 amendments, 14 occurred prior to the first of the entries disputed in this case. Those 14 amendments raised the total price from $42,544,884 to $69,884,962—an increase of $21,340,078.[1] Of the 200-plus engineering change orders, the great majority—approximately 170—were issued after the last of the entries disputed this case. The engineering change orders amounted, in the aggregate, to more than $20 million, most of which was paid to OIW for work performed while the dies were still in Japan, that is, before importation.

---

[1] Amendments 16 and 17 involved reductions in total cost, resulting in the final order price of $66,075,960.

The base tool order, the amendments, and most of the engineering change orders included a legend that stated: "The price set forth in this purchase order . . . shall be adjusted so as to credit the buyer in the amount, if any, by which such price exceeds actual costs as verified."

Ford made eleven disputed entries of dies relating to the FN-36 program between February 2, 1989, and March 12, 1989.  The declared value of each of those entries was the merchandise invoice price—a total of $63,078,426.  Gross Negligence Decision, 387 F. Supp. 2d at 1310.  Ford paid $2,454,906 in duty on that declared amount.  Tool order amendment 14, dated January 16, 1989—the amendment closest in time to the disputed entries—shows a total tooling price of $69,884,962.  Including amounts incurred via change order, the total value of the merchandise exceed $90 million.  The agency then known as the United States Customs Service ("Customs")[2] ultimately determined that the undeclared value of the entries amounted to $21,314,111.

Customs filed its complaint on January 24, 2002, alleging that Ford undervalued the eleven entries, resulting in a material omission in violation of 19 U.S.C. § 1592.  It asserted, first, that Ford's failure to state that its prices on entry were provisional and subject to adjustment violated 19 U.S.C. § 1484; second, that Ford certified that its declared entry values were true and correct when in fact they were not, also in violation of § 1484; and third, that Ford failed to notify Customs "at once" of information received after importation indicating that entered values were no longer correct, in violation of § 1485.  Ford filed an answer denying liability and asserting that it had made "prior

_____

[2]     The United States Customs Service is now part of the Department of Homeland Security, and is known as the Bureau of Customs and Border Protection.

disclosures" of the violations at issue that precluded liability under 19 U.S.C. § 1592(c)(4). It also filed a counterclaim for a refund of duties it alleged to have overpaid because of valuation errors.

In September of 2004, Ford moved for leave to amend its answer to add a counterclaim for equitable recoupment based on its alleged overpayment of duties resulting from incorrect classifications of some of the entries at issue in the case. The Court of International Trade denied the motion, despite finding that the government would not be prejudiced by the amendment, noting that the amounts Ford sought to recoup were paid to the government voluntarily and were not subject to recoupment, and also that the motion to amend was untimely.

The Court of International Trade held a bench trial from February 28 through March 10, 2005. On July 20, 2005, the court issued a decision rejecting Customs' claim that Ford was guilty of fraud, but finding that Ford had committed gross negligence in violating §§ 1484 and 1485. The trial court ordered Ford to pay $184,495 in unpaid duties and $3 million in penalties. Gross Negligence Decision, 387 F. Supp. 2d at 1334. Ford timely appealed to this court, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

On appeal, Ford argues that it had no legal duty to identify its entry values as "provisional" under § 1484, and that even if it had such a duty, it could not be held liable for violating it consistent with due process of law. It further argues that it fully complied with the "at once" disclosure obligation of § 1485; that it made valid prior disclosures that insulate it from full liability; that the trial court erred in calculating the penalties; and

that the Court of International Trade erred in refusing to permit Ford to amend its answer to include the classification-based counterclaim.

## STANDARD OF REVIEW

We review the Court of International Trade's legal determinations without deference. United States v. Hitachi Am., Ltd., 172 F.3d 1319, 1326 (Fed. Cir. 1999) ("Hitachi II"). We review findings of fact, including findings relating to a party's intent, for clear error. Id. at 1327. Where, as here, Congress has delegated to the judiciary discretion to determine the amount of civil penalties under a statute, we review the trial court's calculation of such penalties for abuse of discretion. See, e.g., Sierra Club, Lone Star Chapter v. Cedar Point Oil Co., Inc., 73 F.3d 546, 573-74 (5th Cir. 1996) (reviewing district court's penalty determination under 33 U.S.C. § 1319(d) for abuse of discretion); see also Atlantic States Found., Inc. v. Tyson Foods, Inc., 897 F.2d 1128, 1142 (reviewing district court's penalty determination under 33 U.S.C. § 1319(d) for abuse of discretion).

## DISCUSSION

### I. 19 U.S.C. § 1484

#### A.

In Ford I, we concluded that, pursuant to our decision in Hitachi II, the due process clause prevents the courts from imposing upon Ford liability for failing to disclose provisional pricing upon entry pursuant to 19 U.S.C. § 1484. The entries at issue in this case occurred during essentially the same time period, and were subject to the same statutory and regulatory scheme, as the entries in Ford I and in Hitachi II. The same due process considerations therefore apply to Ford in the case at bar, absent

some distinguishing factor. The government points to two potentially distinguishing facts. First, it alleges that "Ford had actual knowledge that importers must advise Customs when the price is not final." Second, it asserts that in this case, unlike the others, "Customs' Import Specialists testified that the correct way to enter goods where the final price was not known was to note that fact on the entry documents."

The government's arguments are not persuasive. The testimony it identifies as establishing Ford's actual knowledge that the law required disclosure of provisional pricing does not, in fact, do so. Ford's witness Gibson unequivocally stated that any obligation to disclose provisional pricing was entirely based upon voluntary Ford policies, not legal requirements. Neither does the cited deposition testimony of Ford's witness Kruzich in any way support the existence of such knowledge.

With respect to testimony by Customs officers that the correct way to enter goods subject to variable pricing was to disclose that fact on entry documents, none of the testimony cited by the government establishes, or even purports to establish, that "actual Customs practice required disclosure" of provisional pricing information. See United States v. Hitachi Am., Ltd., 964 F. Supp. 344, 387 (Ct. Int'l Trade 1997) ("Hitachi I"). None of the witnesses relied on by the government states affirmatively that importers were required by law to disclose provisional pricing information at the time of entry; at most, their testimony suggests that importers often did so voluntarily.

This case, therefore, is indistinguishable from Ford I and from Hitachi II. The due process clause of the Fifth Amendment prevents the imposition of liability on Ford for failure to disclose provisional pricing information when neither the applicable statute nor

regulations clearly requires it. We therefore reverse this portion of the trial court's decision.

B.

The government also argues, however, that because most of the amendments to the tooling work order occurred prior to the relevant entry dates, Ford violated § 1484 by virtue of the fact that it knew with certainty that the correct prices were substantially higher than the declared prices. As of January 16, 1989, for example—two weeks before the first entry—Ford knew that the then-current total price based on amendments alone was $69,884,962—about $6 million more than the declared value. If engineering change orders are included, the true value of merchandise was about $87 million, or $24 million more than the declared value. Testimony at trial indicated that, as of the entry dates, "Ford could have ascertained" the true total price of the goods. Thus, the government asserts, even if Ford had no obligation to state the provisional nature of its entry values, it clearly misrepresented what the correct values were, to the extent they were known.

Ford disputes the government's assertion that Ford could have ascertained the costs of the engineering change orders and incorporated them into the prices declared at entry. It asserts that it could not have known whether any particular change order called for work to be done in the United States—in which case it would be non-dutiable—or in Japan. In fact, Ford claims that because it froze all engineering changes in Japan as of Thanksgiving, 1988, all change orders issued thereafter would result in work being done in the United States, such that the company had a reasonable belief that none of those change orders would result in an increase in dutiable amounts. Only

years later, Ford claims, after the completion of its audit, could Ford know which engineering changes involved dutiable, and which involved non-dutiable, charges. Ford also points out that even in this litigation, Customs—having had access to all the relevant records for many years—seems unable to identify the value that Ford should have declared in its entries, variously suggesting that it is $69 million, $87 million, "in excess of" $93 million, and "over" $84 million. If Customs cannot identify the correct amount with the benefit of discovery and hindsight, Ford reasons, Ford itself could not reasonably be expected to have done so at the time of entry. Ford further suggests that Customs' inability to ascertain the correct amount casts considerable doubt on whether it proved at trial that Ford's declared value of $63 million was incorrect.

The Court of International Trade, addressing these issues, concluded that Ford's failure to notify Customs of the engineering change orders at entry constituted a material omission, in violation of § 1484. Gross Negligence Decision, 387 F. Supp. 2d at 1321. Because significant numbers of engineering changes were "known at the time of importation," the trial court held that "the entry value of the FN-36 dies should have included any engineering changes dated before February 2, 1989." Id. at 1322. It further held that, based upon information in the purchase orders themselves, Ford had sufficient data to "account for the engineering changes and convey the correct information to its broker for entry." Id. at 1323. In short, the trial court concluded that (a) the declared values omitted information relating to the engineering change orders, and (b) Ford had in its possession information sufficient to give it knowledge of the true value of the declared entries as of the date of entry.

We agree with the trial court. Although there is conflicting evidence in the record, the Court of International Trade's factual conclusions regarding the engineering change orders and Ford's knowledge of them are not clearly erroneous. The record offers sufficient, if not unequivocal, evidence supporting the findings that change orders occurred that increased the value of the declared entries; that Ford knew of those change orders and their effect on the value of the merchandise; and that Ford failed to use that knowledge to submit true and correct declared values to Customs upon entry. Ford's certification that its entry values were "true and correct" at the time of entry was therefore false, in violation of § 1484.

The next question is whether that violation reflected "gross negligence" on Ford's part. An importer is guilty of gross negligence if it behaved willfully, wantonly, or with reckless disregard in its failure to ascertain both the relevant facts and the statutory obligation, or acted with an utter lack of care. Hitachi II, 172 F.3d at 1328. Because a determination of gross negligence involves a determination of intent, it is an issue of fact, not law. Id. at 1326. As such, we review the trial court's finding of gross negligence for clear error.

Ford's opening brief devotes very little argument to the gross negligence issue, noting only that "it cannot be the case that the failure to provide Customs with information [i.e., the engineering change orders] that would not allow it to calculate duties somehow amounted to a gross negligence." In its reply brief, Ford provides a more comprehensive argument, asserting that "most of the engineering orders were issued after the date of the last entry, which Ford believed meant that the work would be performed in the United States"; that "as to engineering orders issued prior to

importation, Ford did not know what portion of the work would be allocated to U.S., and what portion to foreign, goods and services"; and that "the prices listed were subject to an audit and reconciliation that was not completed until well after entry." These "uncertainties," Ford asserts, "had to be resolved before Ford could properly report adjustments to the dutiable value of the goods." The Court of International Trade, however, found that Ford could have identified the dutiable portions of the pre-entry engineering orders, but failed to do so, and further failed to offer any evidence explaining why. Gross Negligence Decision, 387 F. Supp. 2d at 1322-23. Ford has not offered arguments sufficient to lead us to believe that the trial court's decision in this regard was clearly erroneous. We therefore affirm the CIT's finding of gross negligence.

## II.    19 U.S.C. § 1485

Section 1485 of Title 19 requires an importer to notify Customs "at once" of post-entry payments affecting dutiable value, unless other arrangements have been made with Customs. The trial court found that Ford violated § 1485 in two ways: first, by failing "to fully answer Customs' CF 28s," which are forms submitted to importers by Customs seeking additional information about an entry; and second, by failing "to promptly disclose the information contained in its internal audit of the FN-36 program." Gross Negligence Decision, 387 F. Supp. 2d at 1325. Customs issued CF 28s for seven of the eleven disputed entries; the trial court found that "Ford substantively responded only to two" of the seven, and of those two, one was submitted eight months, and the other 26 months, after the CF-28s were initially issued. Id. Both "substantive" CF-28 responses, the trial court found, "failed to disclose the engineering changes and their affect [sic] on the dutiable value of the FN-36 dies." Id. Because Ford had all the

necessary information to make those disclosures at the time the CF-28s were issued, the trial court concluded, its failure to do so violated the "at once" requirement of § 1485.

Similarly, the Court of International Trade found that Ford's 1991 internal audit was completed on April 30 of that year and contained a breakdown of all 204 engineering orders and the allocation of work between Japan and the United States. That information—as well as information about amendment 17 to the base tool order, which was dated January of 1991—was not disclosed to Customs until August 6, 1991. Id. at 1314-15, 1327. In fact, portions of the audit information—including information about which engineering change orders involved work in Japan and which did not— were not disclosed to Customs until 1994. Id. at 1327.

The repeated failures to disclose information about the engineering orders and the internal audit, the trial court held, violated § 1485 and constituted "indifference and an utter lack of care" regarding Ford's disclosure obligations, resulting in a finding of gross negligence.

On appeal, Ford does not dispute the basic facts as found by the trial court but asserts, instead, that "Ford complied with its section 1485 obligations when it informed Customs on several occasions, beginning no later than November 1989, that entered values were provisional and that Ford would not be able to determine final values until it concluded its audit and reconciled with its vendor." Appellant's Br. at 30. It points to evidence in the record that "Customs' own witnesses . . . knew, or were aware, of the provisional nature of die and tooling entries." With respect to the engineering change orders, Ford asserts that those orders did not "necessarily and instantly determine the

dutiable value of the goods," because it could not be known until the audit was complete "the extent to which the goods or services were to be sourced in the United States or abroad." With regard to the internal audit, Ford asserts that the Court of International Trade misunderstood "the nature of that audit," which "was conducted by Ford's finance division to permit Ford to conclusively demonstrate how much it owed OAC," and "was only the beginning of the process by which Ford would determine how much the FN-36 tool order price changes had affected dutiable value." Ford points to evidence that OAC was working on segregating the dutiable and non-dutiable values until June 28, 1991, such that "the most that can be said is that Ford took about 40 days . . . to finalize its reconciliation and inform Customs of the impact on duties of the engineering orders." Finally, Ford argues that this court reversed a finding of gross negligence in much more egregious circumstances in Hitachi II, and that by that standard Ford's conduct here could have amounted, at worst, to simple negligence.

Ford's explanation regarding the failure to timely report the audit results is unpersuasive. The evidence demonstrates that Ford issued amendment number 17 to the tool order in January of 1991—three months before the April 30 audit was ostensibly complete—and that amendment 17 reduced the total tool order price by $1.7 million based upon an "audit reduction." The trial court found, and Ford does not here contest, that the existence of amendment 17 demonstrates that Ford had knowledge of the contents of the audit long before April 30, 1991, but did not disclose any of those contents until August 6, 1991. Moreover, Ford asserts that it was unable to provide the audit results to Customs before August 6, 1991, because it needed time for OAC to "segregate the final price paid between dutiable and nondutiable goods and services,"

that is, goods and services provided in Japan and in the United States. The August 6, 1991 letter, however, does not even provide that information, merely stating conclusorily that "the estimated undeclared value" of the change orders was "$16.7 million," without providing any breakout of those numbers indicating which change orders related to work occurring in Japan. In fact, the trial court found, and Ford does not here dispute, that the audit information used to produce those numbers was not provided to Customs until 1994. Gross Negligence Decision, 387 F. Supp. 2d at 1327.

Finally, with respect to Ford's argument that our decision in Hitachi II compels a reversal of the trial court's finding of gross negligence, we conclude that it is without merit. A finding of gross negligence is a question of fact and may be overturned only if clearly erroneous. Hitachi II, 172 F.3d at 1329. In Hitachi II, we reviewed a Court of International Trade finding that the defendant's conduct was not grossly negligent. Relying upon the trial court's findings regarding witness credibility, a legal opinion obtained in good faith, and the restricted standard of review of factual questions, we concluded that "we cannot say that the Court of International Trade clearly erred in failing to find that gross negligence was proven by clear and convincing evidence." Id. at 1330.

The posture of this case is the opposite of that presented in Hitachi II, and the standard of review this time favors the government. The trial court found that Ford acted with gross negligence, and we may overturn that finding only if it was clearly erroneous. For all the reasons set forth above, we conclude that the trial court's finding of gross negligence was not clearly erroneous.

## III. Prior Disclosures

Section 1592(c)(4) of Title 19 provides a safe harbor for "prior disclosures"—disclosing of import law violations before, or without knowledge of, the commencement of a formal investigation of the violation. Making such a prior disclosure limits the available penalty to interest on the amount of duties, taxes, and fees of which the government was deprived by the violation. 19 U.S.C. § 1592(c)(4)(B). A formal investigation is considered to have commenced "with regard to the disclosing party and the disclosed information on the date recorded in writing by the Customs Service as the date on which facts and circumstances were discovered or information was received which caused the Customs Service to believe that a possibility of a violation" existed. The importer has the burden of proof in establishing lack of knowledge of commencement of the investigation.

The trial court found that Ford's August 6, 1991 letter to Customs disclosing the engineering changes and amendments was "the only communication that could qualify as a prior disclosure." Gross Negligence Decision, 387 F. Supp. 2d at 1329. It concluded, however, that Customs' investigation of Ford began much earlier—no later than March 8, 1991—and that Ford "had knowledge of the investigation by June 7, 1991," precluding Ford from taking advantage of the prior disclosure rule under § 1592(c)(4). Id. In reaching those conclusions, it relied primarily on the provisions of 19 C.F.R. § 162.71(d), which set forth the criteria for determining the start of a formal investigation. That section states that an investigation is deemed to have commenced on the earliest of the following: (1) "the date recorded in writing in the investigatory record, including contemporaneous notes, as the date upon which an agent believed

the possibility of a violation existed"; (2) the date an investigating agent properly identified herself or himself and the nature of her or his inquiry, in writing or in person and inquired about the disclosed violation"; or (3) "the date an investigating agent, after properly identifying herself or himself, and the nature of her or his inquiry, requested specific books and records relating to the disclosed violation."  Relying on § 162.74(d)(4)(i), the trial court concluded that on March 8, 1991, Customs agent Turner "suspected a violation regarding Ford" and took contemporaneous notes indicating that suspicion.  Id.  Further, the trial court held, "the arrival of a Customs summons on June 7, 1991, should have alerted Ford an investigation was underway."  Id.

On appeal, Ford asserts that the Customs investigation could not have begun before August 21, 1991, and that it could not have known it was under investigation prior to that date.  It points to the first Report of Investigation ("ROI") specifically relating to the Ford investigation, which is dated August 21, 1991, and which states that "[t]his report initiates formal investigation of this matter."  The ROI later states that "this issue was previously investigated as part of the OAC case . . . . This report initiates a separate, formal investigation of FORD's failure to declare the full value of the stamping dies purchased from OAC and OIW."  Another Customs document, this one dated August 27, 1991, states that Ford's August 6, 1991, letter was provided "[i]n response to" the June 7, 1991, summons, and that "[a]s a result" of that August 6 letter, Customs "has opened a separate, formal investigation related to FORD's imports."

Ford's arguments are without merit.  We note, first, that the district court made no finding that Ford's submission of August 6, 1991, qualified as a prior disclosure.  The court said merely that was "the only communication that could qualify as a prior

disclosure," and went on to conclude that Ford was under investigation and had knowledge of that investigation prior to August 6, 1991. Gross Negligence Decision, 387 F. Supp. 2d at 1329. The trial court never reached the question of whether Ford's submission qualified as a prior disclosure or not. More important, although the terms of the August 21, 1991, Report of Investigation indicate that the investigation did not begin until that date, Customs' regulations clearly permit a finding that a formal investigation has commenced with much less evidence than a formal ROI. Those regulations permit a finding that a formal investigation has begun as of "the date upon which an agent believed the possibility of a violation existed," if that date is recorded in writing in "contemporaneous notes." Agent Turner's notes of March 8, 1991, may be ambiguous in this regard—although they focus on Ford and die-related issues, they do not make any specific reference to an investigation of Ford—but Turner himself testified that he was investigating Ford's FN-36 program at that point.

Ford's knowledge of the investigation is a question of fact, reviewable for clear error. There is evidence in the record that Ford itself understood the June 7 summons to constitute "notice that it (Ford) was under investigation for the importation of stamping dies from Ogihara." In light of this evidence, we cannot conclude that the CIT's finding that Ford had knowledge of the investigation as of June 7, 1991, was clearly erroneous.

IV.     Ford's Motion to Amend the Complaint

The Rules of the Court of International Trade permit the court to grant a motion for leave to amend a pleading "only by leave of the court or by written consent of the adverse party," but specifies that "leave shall be freely given when justice so requires." R. Ct. Int'l Trade 15(a). The Court of International Trade has stated that it considers

such motions "on a case-by-case basis, considering a variety of factors," including timeliness, potential prejudice, whether additional discovery will be necessary, and the procedural posture of the litigation. United States v. Optrex, 2005 WL 3447611 at *2 (Ct. Int'l Trade Dec. 15, 2005). We review the denial of such a motion for abuse of discretion. Saarstahl AG v. United States, 177 F.3d 1314, 1320 (Fed. Cir. 1999).

In September of 2004, after the close of discovery in this case, Ford filed a motion for leave to amend its answer to add a counterclaim for "equitable recoupment of any overpayments made on the eleven entries" listed in its complaint. It alleged that its November 22, 1991, tender of $689,775 was based on "an overstated calculation of the undervaluation," because of a classification error. The trial court denied the motion on grounds of "futility" and untimeliness, ruling that the counterclaim was "futile because the duty paid in 1991 on the subject entries was voluntarily tendered under 19 U.S.C. § 1514(c) and § 1592(c)(4) (2000)." Section 1514 provides that Customs Service decisions regarding "the classification and rate and amount of duties chargeable . . . shall be final and conclusive . . . unless a protest is filed in accordance with this section." 19 U.S.C. § 1514(a). Section 1514(b)(2) states that "protests may be filed . . . by . . . any person paying any charge or exaction." A voluntary tender of duties is not a "charge or exaction," and therefore cannot be the subject of a protest; and since it cannot be the subject of a protest, it is "final and conclusive upon all persons" under § 1514(a). Therefore, the trial court ruled, the counterclaim lacked any statutory basis.

The Court of International Trade also ruled that the motion to amend was untimely, noting that although Ford was aware of "the relevant information" by February of 2004, it "dawdled until the end of September 2004, to file its motion." Given that

discovery had closed the previous month, the trial court concluded that the timing of Ford's motion was "selective," and denied it despite its finding that Customs would not be prejudiced by the amendment.

On motion for reconsideration, the trial court again denied Ford's motion, stating that "the government's present penalty case for loss of revenue is limited to Ford's alleged failure to declare the full value of the entries, and not any classification issue," and that "[t]he issue of whether the subject entries are properly classified . . . is not before the Court."

On appeal, Ford argues that the district court erred as a matter of law in concluding that the counterclaim was futile and abused its discretion in denying the motion as untimely. It relies on 19 U.S.C. § 1592(e), which provides that "[n]otwithstanding any other provision of law . . . all issues, including the amount of the penalty, shall be tried de novo." Ford claims that de novo review under § 1592 applies to all matters relevant to the determination of the penalty, and that because the penalty is a function of the duties owed, classification of the goods is properly within the scope of any § 1592 trial. The trial court, responding to that argument, ruled that "[t]he Court's de novo review under 19 U.S.C. § 1592(e) does not open the door to every aspect of the subject entries, but only over the valuation issues associated with the amount of the penalty." The central issue on appeal is whether the de novo review provision of § 1592(e) requires the Court of International Trade to consider arguments relating to the calculation of the penalty but not directly relating to the violations at issue in the litigation.

The government points to several decisions of this court that, it claims, limit the scope of a § 1592 proceeding to those duties "resulting from" the alleged § 1592 violation.  See, e.g., Pentax Corp. v. Robinson, 125 F.3d 1457, 1462 (Fed. Cir. 1997); United States v. Blum, 858 F.2d 1556, 1569 (Fed. Cir. 1988).  Both Pentax Corp. and Blum, however, deal with actions for the recovery of unpaid duties by Customs under § 1592(d)—not with actions for penalties under § 1592(e).  Section 1592(d) expressly provides that "if the United States has been deprived of lawful duties . . . as a result of a violation of [§ 1592(a)], the Customs Service shall require that such lawful duties. . . be restored, whether or not a monetary penalty is assessed."  Section 1592(e) makes no reference to amounts lost "as a result of" the § 1592 violation.  Pentax Corp. and Blum are therefore inapposite to the case at bar.  In fact, the only decision of this court to construe § 1592(e)(1)—albeit in a very different context—appears to have construed it broadly, to permit the Court of International Trade to determine de novo not only the amount of the penalty, but what party is ultimately responsible for paying it, even if that party is not the party initially charged by Customs.  See United States v. Priority Prods., 793 F.2d 296, 299 (Fed. Cir. 1986) (holding that "so long as some 'civil penalty exists' the Court of International Trade can assume jurisdiction over any complaint to recover that penalty, and the issue of who is ultimately responsible for payment is subject to de novo consideration"); see also Tikal Dist. Corp. v. United States, 970 F. Supp 1056, 1061 (Ct. Int'l Trade 1997) (stating that § 1592 "provide[s] a complete judicial remedy for those who believe that Customs has wrongfully assessed a penalty," because "the statute allows a party to obtain de novo review of a government claim from the Court of International Trade before paying any penalty").

The most complete analysis of the <u>de novo</u> review provision of § 1592(e) occurred in a Court of International Trade decision that issued on December 15, 2005—the day Ford's opening brief was filed. In <u>United States v. Optrex</u>, No. 05-160 (Dec. 15, 2005), 2005 WL 3447611, the Court of International Trade considered the government's motion to amend its complaint to allege higher levels of culpability than it originally alleged, citing newly available information indicating a basis for claims of fraud and gross negligence, rather than simple negligence. It cited § 1592(e) for the proposition that "as long as the United States commenced a section 1592 action, there is no limitation upon the 'issues' addressed or the 'amount of the penalty.'" <u>Id.</u> at *4.

The trial court denied the motion, concluding that "the de novo standard [in § 1592(e)] refers to the issues in the context of a specific claim based on one of the three types of section 1592 violations and does not allow the court to review entirely new penalty claims." <u>Id.</u> In so concluding, it relied on its understanding of the statute's "basic purpose," which, it stated, was "to give an importer an opportunity to fully resolve a penalty proceeding before Customs, before any action in [the Court of International Trade]." <u>Id.</u> It read the legislative history of § 1592(e) as "support[ing] the analysis that the administrative penalty claim underlies the suit brought by the United States under section 1592(e)." <u>Id.</u> (citing S. Rep. 95-778 at 19-20 (1978)). In other words, the Court of International Trade in <u>Optrex</u> effectively limited the <u>de novo</u> review provided for in § 1592(e) to those issues considered in the proceedings before Customs.

Although we are not bound by the Court of International Trade's decision in <u>Optrex</u>, we conclude that it correctly defines the proper scope of § 1592(e). The legislative history suggests that one purpose of § 1592(e)'s <u>de novo</u> review provision

was to permit judicial review of the amount of the assessed penalty—something that the old version of § 1592 did not permit.  <u>See</u> S. Rep. 95-778 at *2, *20 (1978).  Its intended function appears to have been not to throw open the litigation to any issue conceivably relevant to the determination of the penalty, but simply to "emphasize[ ] lack of deference to Customs' final determination, including its findings of fact under § 1592(b)."  <u>Optrex</u>, 2005 WL 344761 at *4.  There is no basis, either in the legislative history or in common sense, for Ford's contention that § 1592(e) was intended to permit an importer to end-run the protest provisions of § 1514 and litigate, in a penalty proceeding, issues unrelated to the investigation that identified the violation and that would otherwise have been long foreclosed.  Neither can this court's decision in <u>Priority Productions</u> be construed to permit such a result.

Because we conclude that the district court did not abuse its discretion in denying the motion to amend based upon futility, we need not reach the timeliness issue.  Were we to reach it, however, we would be very reluctant to disturb the trial court's finding of untimeliness, especially in light of its conclusion that the timing of Ford's motion was "selective."

## V.    The Penalty

Ford's argument that the trial court abused its discretion in assessing a penalty just slightly lower than the statutory maximum is based almost entirely on its contention that Ford's existing compliance measures somehow should have required mitigation of the penalty.  The district court's conclusion that those compliance measures failed repeatedly in this case is sufficient to rebut Ford's argument.

In addition, our reversal in part of the Court of International Trade's judgment of liability for violations of 19 U.S.C. § 1484 requires no adjustment to the assessed penalty. Although Ford cannot constitutionally be held liable for failing to report the provisional nature of its entries, its failure to report the true and complete value of those entries at the time of entry constituted an independent violation of § 1484. There is thus no basis for any reduction in the penalty based upon the partial reversal of the trial court's judgment.

## CONCLUSION

The trial court's judgment is hereby affirmed in part and reversed in part.

<u>AFFIRMED IN PART and REVERSED IN PART.</u>

No costs.